# In the

# United States Court of Appeals

## For the Seventh Circuit

No. 07-3686

UNIVERSITY OF CHICAGO,

*Plaintiff-Appellant,*

*v.*

UNITED STATES OF AMERICA,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 06 C 3452—**George W. Lindberg**, *Judge.*

ARGUED JUNE 3, 2008—DECIDED OCTOBER 29, 2008

Before KANNE, SYKES, and TINDER, *Circuit Judges.*

TINDER, *Circuit Judge.* This appeal considers the meaning of the phrase "salary reduction agreement." The University of Chicago did not pay, report, or withhold Federal Insurance Contributions Act (FICA) tax between 2000 and 2003 for payments made under its employee retirement plans. The Internal Revenue Service (IRS) assessed FICA tax plus penalties and interest on contributions made under the University's retirement plans. In this case, FICA tax liability turns upon whether the payments

made under the plans were pursuant to "salary reduction agreements." The University is currently appealing from the district court's grant of summary judgment in favor of the government. We affirm.

## I. Background

The University of Chicago, one of the world's foremost universities, is an Illinois not-for-profit corporation. As is relevant to this appeal, the University maintains two retirement plans for its employees, the Contributory Retirement Plan (CRP) and the Retirement Income Plan for Employees (ERIP). CRP applies to academic and highly compensated employees, and ERIP applies to nonacademic and lower-compensated employees. Participation in the applicable plan is mandatory for all eligible employees as a condition of employment.[1] The plans require employees to "contribute" specified percentages of their salaries; the University, in turn, contributes additional amounts, specified as percentages of the employees' salaries. For example, under CRP during the 2000-2003 tax years, an employee was required to contribute 5% of her salary, and the University was required to contribute an amount equal to 7.5% of the employee's

---

[1] Certain employees can participate only on a voluntary basis, such as employees who are under age twenty-five or have not yet completed two years of service. The University of Chicago does not contest that FICA tax was properly assessed as to the contributions for voluntary participants; only the FICA tax for mandatory plan participants is at issue in this case.

salary. The contributions by the employee and employer are used to fund the purchase of annuity contracts on behalf of the employee. ERIP functions similarly.

FICA is a payroll tax that funds Social Security and Medicare programs. An employee and employer are both taxed 6.2% of the employee's wages for Social Security (up to a specified limit) and 1.45% of the employee's wages for Medicare. 26 U.S.C. §§ 3101, 3111. An employer is required to deduct and withhold the employee's share of FICA taxes from the employee's wages, remit the withheld taxes to the IRS every quarter, and report the amount of withheld taxes on a quarterly tax return. *Diamond Plating Co. v. United States*, 390 F.3d 1035, 1037-38 (7th Cir. 2004) (citing §§ 3101-3111). The employer is liable for the tax that it is required to deduct and withhold from the employee. 26 U.S.C. § 3102. Employers are subject to penalties for failure to deposit taxes "unless it is shown that such failure is due to reasonable cause and not due to willful neglect." *Id.* § 6656(a).

The employer and employee tax liability for FICA turns upon the definition of "wages" in the Internal Revenue Code; the term is broadly defined but followed by specific exceptions. *Univ. of Chi. Hosp. v. United States*, No. 07-1838, 2008 WL 4301442, at *2 (7th Cir. Sept. 23, 2008). "Wages" includes "all remuneration for employment," but certain kinds of payments are excepted. 26 U.S.C. § 3121(a)(1)-(23). The exception at issue here includes "any payment made to, or on behalf of, an employee or his beneficiary . . . under or to an annuity contract described in section 403(b), other than a payment

for the purchase of such contract which is made by reason of a salary reduction agreement (whether evidenced by a written instrument or otherwise)." *Id.* § 3121(a)(5)(D).

On May 13, 2005, the IRS assessed the University with additional FICA taxes, as well as failure to deposit penalties and interest for each quarter during the 2000-2003 tax years, based upon the University's failure to report, withhold, or pay FICA taxes on the payments made under CRP and ERIP. The University paid divisible portions of the assessed amounts.[2] The IRS later assessed additional penalties based on the University's failure to pay the full amounts originally assessed, and the University also paid divisible portions of those additional penalties and interest. The University claimed refunds from the IRS, which the IRS denied. The University then filed suit in the Northern District of Illinois challenging the refund denials; the government counterclaimed for the unpaid portions of the assessed amounts.

Both parties moved for summary judgment. The district court considered and rejected the University's argument that the language "made by reason of a salary reduction agreement" is ambiguous. *Univ. of Chi. v. United States*, No. 06-C-3452, 2007 WL 2409793, at *2 (N.D. Ill. Aug. 22,

---

[2] The "divisible tax doctrine" allows a taxpayer to challenge an assessment of a divisible tax in the district court without paying the full assessed amount. *Ruth v. United States*, 823 F.2d 1091, 1093 (7th Cir. 1987). We will discuss this in more detail in Part III, *infra*.

2007). The court concluded that both plans fell "squarely within" the definition of "wages" and if Congress had intended the subsection to apply only to "individually negotiated salary reduction agreements," as the University suggested, Congress would have added those words. *Id.* In support for its decision, the court cited *Public Employees' Retirement Board v. Shalala*, 153 F.3d 1160 (10th Cir. 1998), which concluded that the term "salary reduction agreement" (as used in another subsection of the Internal Revenue Code) included mandatory plans. The court also acknowledged but rejected the University's argument that a revenue ruling from 1965 and a treasury regulation in effect prior to 2005 supported its interpretation. *Univ. of Chi.*, 2007 WL 2409793, at *3. The court declined to address the University's analysis of legislative history, finding that it would be improper where the subsection was unambiguous. *Id.* Finally, the court determined that the University should be liable for a failure-to-deposit penalty because the obligation to withhold was precise and not speculative—the University's failure to deposit was "at best . . . willful blindness to the plain meaning of the governing statute." *Id.* at *4. Similarly, the court found that the University should be liable for a failure-to-pay penalty, despite the University's argument that the penalty was inconsistent with the divisible tax doctrine: "[I]t is one thing to say that a taxpayer need not pay the total tax in order to gain entry to the courthouse, and quite another to say that the taxpayer may escape the penalty for failure to timely pay the tax by filing a lawsuit." *Id.*

## II.  Salary Reduction Agreement

The district court granted the government's motion for summary judgment based purely upon a decision of law, which we review de novo. *Officer v. Chase Ins. Life & Annuity Co.*, No. 07-2826, 2008 WL 4059780 (7th Cir. Sept. 3, 2008). The meaning of "salary reduction agreement" is a matter of statutory interpretation, and we begin by considering the language of the statute. *United States ex rel. Fowler v. Caremark RX, L.L.C.*, 496 F.3d 730, 738 (7th Cir. 2007). We also consider the context of the provision because "the meaning—or ambiguity—of certain words or phrases may only become evident when placed in context . . . . It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 127 S. Ct. 2518, 2534 (2007) (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132 (2000)) (internal quotation marks omitted).

On appeal, the University of Chicago argues that Congress intended the "salary reduction agreement" language of § 3121(a)(5)(D) to include a salary reduction agreement in the FICA wage base only if the agreement reflected an employee's voluntary choice to receive a lower stated salary plus payments to purchase annuity contracts in lieu of receiving cash. In addition to discussing the plain language, the University directs our attention to revenue rulings, regulations, and the statute's legislative history to demonstrate Congressional intent. The government argues that the proper distinction drawn

in § 3121(a)(5)(D) is between payments that are salary reductions as compared to payments that are salary supplements. As might be expected, the government provides alternative explanations for the revenue rulings, regulations, and legislative history relied upon by the University.

The language of § 3121(a)(5)(D) sets up an exception-to-the-exception definition of wages. "Wages" includes all remuneration for employment, except payments "made to, or on behalf of, an employee or his beneficiary . . . under or to an annuity contract described in section 403(b)." It excludes those payments for the purchase of such contracts which are made by reason of salary reduction agreements. The University contends that the plain language supports its interpretation that the agreement must be individually negotiated through an employee's voluntary election to receive a lower stated salary plus payments to purchase annuity contracts. The use of the term "agreement" requires a choice, it argues. The University's employees were not given a choice because participation in CRP and ERIP was mandatory; therefore, the payments were not made pursuant to a salary reduction agreement or subject to FICA tax.

In *Public Employees' Retirement Board*, the Tenth Circuit considered the meaning of "salary reduction agreement" in a different subsection of § 3121, which dealt with payments that were treated as employee contributions but had been "picked up" by the local or state government employers. The "pickups" were mandatory through a state statute. The Retirement Board made a

similar argument as the University makes now—that a salary reduction agreement had to be individually negotiated and voluntary. The Tenth Circuit held that "salary reduction agreement" in the context of government pickups included mandatory plans—for reasons we will discuss in more detail later—and it rejected the Retirement Board's contention that an agreement had to be individually negotiated. *Public Employees' Retirement Board*, 153 F.3d at 1165-66. The court cited the Second Restatement of Contracts and determined that:

> [a]n "agreement" is not limited to individually negotiated contracts . . . but may also refer generally to a manifestation of mutual assent on the part of two or more persons. . . . Here, an employee's decision to go to work or continue to work as a State employee constitutes conduct manifesting assent to a salary reduction in exchange for the State's contribution to a pension plan on the employee's behalf. The employee has "agreed" to the salary reduction by continuing employment with the State.

*Id.* at 1166 (internal citations omitted). We agree with our sister circuit that Congress's use of the word "agreement" in this provision does not foreclose mutual assent through something other than individual negotiation or "voluntary" election.[3]

---

[3] In fact, for several years the University even titled its ERIP form "Salary Reduction Agreement." The University explains

(continued...)

Standing alone, § 3121(a)(5)(D) is more susceptible to the government's interpretation that the provision distinguishes between a salary supplement, i.e., "any payment made to, or on behalf of, an employee or his beneficiary . . . under or to an annuity contract described in section 403(b)," and a salary reduction, i.e., "a payment for the purchase of such contract which is made by reason of a salary reduction agreement." The University's argument that the provision refers to voluntary elections does not rest solely upon the language of § 3121 itself, though. And so we wade into the murky waters of "context" in the tax code to look for evidence of the meaning asserted by the University.

The current version of § 3121(a) was enacted in 1983. Versions of that section date back to 1939: "The term 'wages' means all remuneration for employment . . . except that such term shall not include . . . [t]he amount of any payment made to, or on behalf of, an employee under a plan or system established by an employer . . . (including any amount paid by an employer for insurance or annuities, or into a fund, to provide for any such payment), on account of . . . retirement." Social Security Act Amend-

---

[3] (...continued)
that, for some employees, ERIP was voluntary and so the title was not a misnomer because of those employees—but the employees for whom ERIP was mandatory apparently signed the same form. We attach no legal significance to the title of the form but merely point it out as an interesting backdrop to the discussion at hand.

ments of 1939, ch. 666, § 606, 53 Stat. 1360, 1383 (1939).[4] This excluded employer-contributed funds from taxation under FICA, so as to "eliminate any reluctance on the part of the employer to establish such plans due to the additional tax cost." *New England Baptist Hosp. v. United States*, 807 F.2d 280, 283 (1st Cir. 1986) (citing H.R. Rep. No. 76-728, *reprinted in* 1939-2 C.B. 538, 542).

In 1965, the IRS issued a revenue ruling responding to advice sought by an employer as to whether amounts used to purchase an annuity contract for an employee under an agreement that reduced the employee's salary constituted employer contributions (not subject to FICA) or employee contributions (subject to FICA). Rev. Rul. 65-208, 1965-2 C.B.383. The ruling held that the amounts should be considered employee contributions and subject to FICA. *Id.*

In 1981, the Supreme Court decided *Rowan Companies, Inc. v. United States*, 452 U.S. 247 (1981), which considered whether the value of meals and lodging for employees on offshore oil rigs provided for the employer's convenience should be included in the computation of "wages" for purposes of FICA and Federal Unemployment Tax Act (FUTA) tax. The Court looked to comparable sections in the income tax provisions, as well as treasury regulations and legislative history to determine Congressional intent. The Court concluded that the plain language and

---

[4] The Internal Revenue Code of 1954 moved the section to 3121, but the language remained substantially the same until 1983. *See* 26 U.S.C. § 3121(a)(2) (1954).

legislative history indicated that Congress intended "wages" to be treated in the same manner for purposes of income taxation and FICA/FUTA taxation. *Id.* at 263. The meals and lodging amounts were excluded from income tax withholding; therefore, the amounts should also be excluded from FICA and FUTA. *Id.*

After *Rowan*, there was some doubt about the continuing validity of the 1965 salary reduction agreement revenue ruling because amounts paid to purchase annuity contracts under a salary reduction agreement were included in the FICA wage base but were not subject to income tax withholding. S. Rep. No. 98-23, at 180 (1983). Subsequently, Congress codified the 1965 revenue ruling in § 3121. *Temple Univ. v. United States*, 769 F.2d 126, 131 (3d Cir. 1985). It also added a "decoupling" provision to make explicit that "[n]othing in the regulations prescribed for purposes of chapter 24 (relating to income tax withholding) which provides an exclusion from 'wages' as used in such chapter shall be construed to require a similar exclusion from 'wages' in the regulations prescribed for purposes of this chapter." § 3121(a). As previously noted, Congress expressed a purpose in 1939 to eliminate employers' reluctance to establish such plans due to the additional tax cost; courts have noted that by 1983, the focus had shifted somewhat: "In 1983, Congress was looking to solidify the social security system in the face of serious concerns about its solvency. . . ." *New England Baptist Hosp.*, 807 F.2d at 283. The current version of § 3121(a)(1)(D) was created at this time.

The University argues that the 1965 revenue ruling supports its current position. We acknowledge that the

plan at issue in the ruling was a voluntary salary reduction agreement, but we disagree with the University as to the import of that fact. The issue in the ruling was whether a reduction in an employee's salary where the funds were used to purchase annuity contracts for retirement was subject to FICA taxation, even though it was not subject to income tax withholding. Rev. Rul. 65-208, 1965-2 C.B. 383. In the ruling, the IRS noted that the purposes of § 403(b) and § 3121 "are substantially different. Therefore, a determination under section 403(b) of the Code that a particular amount is 'contributed by the employer' for the purchase of an annuity contract does not necessarily require a similar determination that it is also an amount 'paid by an employer' under section 3121(a)(2)." *Id.* The ruling concluded that the funds were considered employee-contributed and subject to FICA tax, even though they were treated as employer-contributed for purposes of income taxation. *Id.* The final paragraph distinguished the ruling from a previous 1953 revenue ruling, which held that an organization that uses its own funds for the purchase of an annuity contract is not subject to FICA tax on the amounts of those funds. *Id.* The IRS explained that the 1965 ruling covered a different situation: "where the employee takes a voluntary reduction in salary to provide the necessary funds." *Id.* While the underlying plan in the ruling was a voluntary agreement, this was not a point of emphasis in the ruling—in fact, the word "voluntary" appeared only once. To the extent that the employee's degree of control may have affected the IRS's distinction between employee-contributed and employer-contributed funds,

the ruling simply did not address it; mandatory salary reductions were certainly not expressly or implicitly excluded from FICA taxation.[5] The government also notes that the distinction drawn by the ruling and by § 3121 is consistent with the original purpose of the FICA exclusion to eliminate any additional tax cost on the employer. If the employer did not contribute a salary-reduced amount to a § 403(b) plan, then the amount would be used instead to pay the employee's salary. Both options would result in the same FICA taxation for the employer. A salary supplement, on the other hand, would result in an additional tax cost for the employer, so it is specially excepted from the definition of "wages."

The University also directs our attention to former Treasury Regulation § 31.3121(a)(2)-1(d), in effect from 1956 to 2005. The regulation set out the FICA exclusion for payments made by an employer to or on behalf of an employee on account of retirement, sickness, disability, or death. It elaborated on several points, one of which stated: "It is immaterial for purposes of this exclusion whether the amount or possibility of such benefit payments is taken into consideration in fixing the amount of an employee's remuneration or whether such payments are required, expressly or impliedly, by the contract of service." 1956-2 C.B. 605, 625. The government explains

---

[5]  The University points out that without employee control or choice, the distinction between employer-contributed and employee-contributed funds leads to an arbitrary label, rather than a functional difference. We address this argument later.

that the payments "required . . . by the contract of service" are employer-payments (i.e., salary supplements), and the provision is merely detailing the rule—which is still in effect today—that employers do not pay FICA taxes on contributions to annuity plans for their employees. We agree. The reference to "fixing the amount of an employee's remuneration" is not equivalent to a salary reduction agreement because the funds contributed are the employer's funds. To a certain extent, of course, all benefits offered to an employee have the indirect effect of reducing the employee's salary. But the point of a salary reduction agreement is that the funds are considered employee-contributed, which is the principle that was later explained in the 1965 revenue ruling.

We also consider the cross-references cited by the University in determining the meaning of § 3121(a)(5)(D). The Internal Revenue Code currently uses the term "salary reduction agreement" in only six sections: § 129 (income taxation of dependent care assistance programs), § 402 (income taxation of employees' trusts), § 403 (income taxation of employee annuities), § 414 (special income taxation rules), § 3121 (FICA definitions), and § 3306 (FUTA definitions). None of the sections provides a definition of "salary reduction agreement," although two sections refer to a "salary reduction agreement (within the meaning of section 3121(a)(5)(D))." §§ 402(g)(3)(C); 414(n)(5)(C)(iii)(III). The University points to the former, § 402(g)(3)(C), as evidence supporting the meaning it asserts.

Section 402(g) provides a limitation on the exclusion from income taxation for elective deferrals. Section

402(g)(3) defines "elective deferrals" (for purposes of that subsection) as the sum of certain employer contributions under other sections of the Code and, under subsection (C), "any employer contribution to purchase an annuity contract under section 403(b) under a salary reduction agreement (within the meaning of section 3121(a)(5)(D))." The University asserts that this language demonstrates that Congress equated salary reduction agreements with elective deferrals. But § 402(g)(3)(C) borrows the meaning of salary reduction agreement from § 3121(a)(5)(D)—§ 402 does not conversely inject its context into § 3121. The University also contends that the other types of employer contributions listed in § 402(g) are payments that involve a cash-or-deferral option, which demonstrates that a salary reduction agreement should also be interpreted as it suggests: a voluntary reduction in salary for purchase of retirement annuities taken in lieu of cash. However, the University ignores § 402(g)'s additional limitation: "An employer contribution shall not be treated as an elective deferral described in subparagraph (C) if under the salary reduction agreement such contribution is made pursuant to a one-time irrevocable election made by the employee at the time of initial eligibility to participate in the agreement or is made pursuant to a similar arrangement involving a one-time irrevocable election specified in regulations." Because all salary reduction agreements are not elective deferrals even within § 402(g) itself, there is no reason to read § 3121 as encompassing only elective deferrals. Moreover, the University's invocation of the nondiscrimination rules in § 403(b)(12) fails to persuade us for the

same reason as § 402(g)(3); the provision uses the term "salary reduction agreement" but further limits and defines it within the same subsection in the same manner that § 402(g)(3) did.

As promised, we now return to *Public Employees' Retirement Board* to consider how the term "salary reduction agreement" was used in § 3121(v)(1)(B). At issue in the case was the FICA tax liability of contributions by employees to state and local government pension plans that had been "picked up" by the government employers, as mandated by state statute. Section 3121(v)(1)(B) states: "Nothing in any paragraph of subsection (a) . . . shall exclude from the term 'wages' . . . any amount treated as an employer contribution under section 414(h)(2) where the pickup referred to in such section is pursuant to a salary reduction agreement (whether evidenced by a written instrument or otherwise)." To determine whether "salary reduction agreement" included mandatory payments, the court analyzed the corresponding § 414(h)(2), and revenue rulings interpreting that section, to ascertain under what circumstances "pickups" occurred. *Public Employees' Retirement Board*, 153 F.3d at 1163-64. The court concluded that pickups require: (1) the employer to specify that the contributions, although designated as employee contributions, are being paid by the employer in lieu of employee contributions; and (2) the employee *cannot have the option* of receiving the contributed amounts directly instead of having them paid by the employer to the pension plan. *Id.* at 1164. Because the second requirement foreclosed voluntary agreements as pickups, the term "salary reduction agreement" in

§ 3121(v)(1)(B) could not coherently exclude mandatory agreements because the provision would never be implicated. *Id.* at 1166. Therefore, the court held that the "salary reduction agreement" provision included mandatory government pickups as "wages" for FICA purposes. *Id.*

The University does not point to a flaw in the reasoning of *Public Employees' Retirement Board*; instead, it argues that, like the Tenth Circuit, we should consider the corresponding section referenced in the subsection at issue—here § 403(b)—to determine the proper context for "salary reduction agreement." If we assumed that the meaning of "salary reduction agreement" as used throughout the Code generally encompasses both voluntary and mandatory agreements, then we agree with the University's premise that we could reach the opposite conclusion of *Public Employees' Retirement Board* without necessarily creating a circuit split—the Tenth Circuit found that § 414(h) implicates only mandatory agreements, so we could find that § 403(b) implicates only voluntary agreements. We do not find, however, that § 403(b) requires us to read that limitation into § 3121(a)(5)(D). Without support for that limitation, the sensible approach, which is consistent with basic rules of statutory construction, would be for us to conclude that § 3121(a)(5)(D), like § 3121(v)(1)(B), includes mandatory salary reduction agreements. *See Arnett v. Comm'r of Internal Revenue*, 473 F.3d 790, 798 (7th Cir. 2007) (citing *Comm'r of Internal Revenue v. Lundy*, 516 U.S. 235, 250 (1996)) (applying the "normal rule of statutory construction that identical words used in different parts of the same act are intended to have the same meaning" (internal quotation

marks omitted)); *In re Willett*, No. 07-1850, 2008 WL 4182649, at *4 (7th Cir. Sept. 12, 2008) ("Courts are obliged to read statutory provisions at issue in such a way as to avoid a conflict between them if such a construction is possible and reasonable."); *Square D Co. & Subsidiaries v. Comm'r of Internal Revenue*, 438 F.3d 739, 745 (7th Cir. 2006) (citing *Alaska Dep't of Envtl. Conservation v. EPA*, 540 U.S. 461, 489 n.13 (2004)) (noting the "cardinal principle of statutory construction" that, if possible, a statute should not be construed to render another "clause, sentence, or word . . . superfluous, void, or insignificant").

Finally, the University argues that the government's position unnecessarily elevates form over substance; whereas, the University's interpretation offers a functional, substantive approach. The University explains that the government's interpretation emphasizes the form of the payments—did the University characterize the payments as a higher stated salary minus a mandatory employee-paid annuity contribution or a lower stated salary plus a larger employer-paid annuity contribution? That form, it argues, is of no economic significance. If the employer mandates a "contribution" of 5% from an employee's salary and contributes an additional amount equal to 7.5% of the employee's salary, the money used for both contributions comes directly from the same source (the University). It makes no difference how that money is characterized. In the context of income taxation, we have previously recognized this argument, noting that the distinction between employer-contributed funds and employee-contributed funds is "almost wholly nominal." *Howell v. United States*, 775

F.2d 887, 887 (7th Cir. 1985). "It is a matter of indifference to an employer whether it pays $30,000 salary to the employee plus $3,000 to a pension plan on the employee's behalf, or instead $33,000 to the employee, of which it sends $3,000 to a pension plan. In either event the employee receives $30,000 at once and $3,000 in deferred compensation, and the employer may deduct the whole $33,000 as an ordinary and necessary business expense." *Id.* Therefore, the University urges us to adopt its "functional" distinction between mandatory and voluntary salary reduction agreements: an employee has "wages" if she could choose to receive an amount in cash but instead directs it to an annuity, and she does not have "wages" if the employer makes a mandatory annuity payment with no cash option.

The distinction between employee-contributed funds and employer-contributed funds might be "nominal" from the employer's perspective, but the difference nevertheless could be significant to the employee. The government responds to the University's form-over-substance argument by pointing out one purported economic distinction: employee-contributed funds count for purposes of Social Security benefits and employer-contributed funds do not; therefore, a salary reduction would result in higher Social Security benefits. The error in this argument is apparent, however, when 42 U.S.C. § 409(a)(4)(E) is consulted. For purposes of calculating Social Security benefits, the term "wages" is defined generally as all remuneration except payments "under or to an annuity contract described in section 403(b) of the Internal Revenue Code of 1986, other than a payment for the

purchase of such contract which is made by reason of a salary reduction agreement (whether evidenced by a written instrument or otherwise)." Salary reduction agreements, therefore, only count for Social Security-benefits purposes if they counted for FICA-taxation purposes. This circular argument adds nothing to the form-over-substance debate. Although not discussed by the parties, one potential economic distinction where the labeling of the source of the funds would matter to both parties is the vesting of contributions. If a plan provided for employer-contributed funds that were not immediately fully vested, both parties would be impacted if the employee left her employment prior to the expiration of the vesting period. Employer-contributed funds would be returned to the employer according to its vesting schedule, while employee-contributed funds would remain with the employee. It appears that employer-contributed funds in CRP and ERIP were immediately fully vested, so this distinction is of no significance to the University or its employees; however, it illustrates that the position favored by the government is not entirely "form over substance" in all situations.

We need not explore any other scenarios looking for economic distinctions, though, because the objective of statutory construction is to carry out Congressional intent, even if that intent is to promote form over substance. We noted in *Howell* that the distinction between employer and employee contributions was merely "one example of the dominance of form over substance in the tax code," and we applied the formal distinction in that case. *Howell*, 775 F.2d at 887-890. We conclude that Con-

gress intended § 3121(a)(5)(D) to include "salary reduction agreements," whether voluntary or mandatory, in the FICA wage base. As noted before, the plain language of the statute demonstrates that the provision distinguishes between a salary supplement, i.e., "any payment made to, or on behalf of, an employee or his beneficiary . . . under or to an annuity contract described in section 403(b)," and a salary reduction, i.e., "a payment for the purchase of such contract which is made by reason of a salary reduction agreement." Nothing in the context provided by the University convinces us that Congress intended a "salary reduction agreement" to apply solely to situations in which an employee voluntarily chose to receive a lower stated salary plus payments to purchase annuity contracts in lieu of receiving cash.[6]

### III. Penalties

Half of the IRS's assessment against the University represents amounts that the University failed to

---

[6] Because we have concluded that the language and context of the provision do not support the University's arguments, we will not delve into the University's analysis of the legislative history. Nonetheless, though some of the language in the legislative history cited by the University indeed references voluntary agreements, *see, e.g.,* H.R. Rep. No. 98-47, at 437 (1983) (Conf. Rep.), none purports to exclude mandatory agreements, and a Senate Report expressly disclaims its intention to designate whether an amount was made by reason of a salary reduction agreement. S. Rep. No. 98-23, at 182 (1983).

withhold from its employees; this aspect of the appeal requires us to determine whether the University should be liable for those amounts. Under § 3102(b), an employer is primarily liable for payment of the taxes that it is required to deduct and withhold from the employee. The University asserts the so-called "deputy tax collector" defense, which excuses an employer from withholding employment taxes from its employees unless the obligation to withhold was "precise and not speculative." *North Dakota St. Univ. v. United States*, 255 F.3d 599, 608 (8th Cir. 2001) (citing *Cent. Ill. Pub. Serv. Co. v. United States*, 435 U.S. 21, 31 (1978)). As the taxpayer, it is the University's burden to show that it did not have sufficient notice of its obligation to withhold. *See Am. Airlines, Inc. v. United States*, 204 F.3d 1103, 1108 (Fed. Cir. 2000). If successfully asserted, the defense would excuse the University from paying only the employees' half of the tax liability. *North Dakota St. Univ.*, 255 F.3d at 608.

The University claims that its obligation to withhold was speculative and not precise in 2000-2003 because there were no judicial decisions, regulations, or rulings that would have given the University notice of this obligation. We disagree. Since 1983, the plain language of § 3121(a)(5)(D) indicated that salary supplements paid by the employer are not included in the FICA wage base but salary reductions are included. To the extent that the use of the word "agreement" might have implied a requirement of voluntariness, the Tenth Circuit rejected that argument in 1998. *Public Employees' Retirement Board*, 153 F.3d at 1166. Further, the courts that have construed the 1965 revenue ruling have characterized its holding

as distinguishing between salary reductions and salary supplements for FICA purposes. *See New England Baptist Hosp.*, 807 F.2d at 282; *Carnisius Coll. v. United States*, 799 F.2d 18, 21 (2d Cir. 1986); *Temple Univ.*, 769 F.2d at 129-30. No court has suggested that the ruling drew an additional line between mandatory and voluntary agreements. Therefore, we conclude that the district court properly determined that the University's obligation was precise and not speculative. *Cf. Cent. Ill. Pub. Serv. Co.*, 435 U.S. at 25-26, 33 (excusing income tax withholding obligation for employee lunch reimbursements where the Internal Revenue Code and regulations did not require it, the Courts of Appeals had been in "disarray" on the issue, and regulations implied that reimbursements were not subject to withholding); *H B & R, Inc. v. United States*, 229 F.3d 688, 692 (8th Cir. 2000) (excusing FICA tax withholding for certain travel expenses where income taxation withholding was required but no case or regulation had ever required FICA withholding for expenses of that kind).[7]

---

[7] The University points to a 2004 temporary regulation, which was finalized in 2007, that explicitly states that salary reduction agreements include agreements made as a condition of employment. Treas. Reg. § 31.3121(a)(5)-2. This does not assist the University in demonstrating that its obligation to withhold was not precise during the 2000-2003 tax years, however, because the regulation did not effect a change in policy. It was promulgated at the same time as temporary and proposed *income* tax regulations that created a new special rule for

(continued...)

The IRS also imposed upon the University failure-to-deposit and failure-to-pay penalties. Failure-to-deposit penalties are imposed for a failure to deposit amounts as required by the Internal Revenue Code or regulation. 26 U.S.C. § 6656. Failure-to-pay penalties are imposed for a failure to pay an amount required to be shown on a tax return or failure to pay an assessment within the requisite time frame. *Id.* § 6651(a)(3). Both penalties are mandatory unless the taxpayer shows that "the failure is due to reasonable cause and not due to willful neglect." *Id.* §§ 6651, 6656; *see also Diamond Plating*, 390 F.3d at 1038. We review a determination of the elements required to prove "willful neglect" or "reasonable cause" de novo, but the presence or absence of those elements in this case is a question of fact which we review for clear error. *See East Wind Indus., Inc. v. United States*, 196 F.3d 499, 504 (3d Cir. 1999) (citing *United States v. Boyle*, 469 U.S. 241, 249 n.8 (1985)).

"Willful neglect" and "reasonable cause" are not defined terms within the Internal Revenue Code. The Supreme Court has construed "willful neglect" as a conscious, intentional failure or reckless indifference. *Boyle*, 469 U.S. at 245. "Reasonable cause" with respect to a failure to pay is defined through a Treasury Regulation and mea-

---

[7] (...continued)
mandatory salary reduction contributions, and its purpose was to make explicit the FICA treatment of such agreements, notwithstanding the new regulations for income taxation. *See* 69 Fed. Reg. 67054, 67075.

sured by "the extent that the taxpayer has made a satis-factory showing that he exercised ordinary business care and prudence in providing for payment of his tax liability and was nevertheless either unable to pay the tax or would suffer an undue hardship . . . if he paid on the due date." *In re Carlson*, 126 F.3d 915, 921 (7th Cir. 1997) (citing 26 C.F.R. § 301.6651-1(c)(1)). The taxpayer faces a "heavy burden" to show that it exercised ordinary business care and prudence. *Richardson v. Comm'r of Internal Revenue*, 125 F.3d 551, 557 (7th Cir. 1997) (citing *Boyle*, 469 U.S. at 689-90). There is no similar regulation defining "reasonable cause" for a failure to deposit (although there is an exception for first-time depositors, which is not applicable here). *See* 26 C.F.R. § 301.6656-1(a). The University's sole argument is that its failure to deposit was due to a "cogent interpretation" of the law. The University's interpretation was unsupported and unreasonable; therefore, we agree with the district court's conclusion that the University has not sustained its heavy burden in showing that its failure to deposit was due to reasonable cause.

Finally, the University argues that the IRS should not have imposed failure-to-pay penalties for its failure to pay the assessments because the University paid divisible portions in order to institute a refund suit. As a general rule, to challenge an assessment in a district court, a taxpayer must pay the full amount of the assessed tax and then pursue a refund. *Flora v. United States*, 362 U.S. 145, 177 (1960) (*Flora II*); *Ruth v. United States*, 823 F.2d 1091, 1093 (7th Cir. 1987). Full payment is a juris-dictional prerequisite imposed by Congress. *See Flora v.*

*United States*, 357 U.S. 63, 64-65, 75 (1958) (*Flora I*), *aff'd on reh'g*, *Flora II*, 362 U.S. at 177. Where a tax is "divisible," however, "the taxpayer may pay the full amount on one transaction, sue for a refund for that transaction, and have the outcome of this suit determine his liability for all the other, similar transactions." *Korobkin v. United States*, 988 F.2d 975, 976 (9th Cir. 1993) (per curiam); *Ruth*, 823 F.2d at 1093. The government will usually bring a counter-claim for the remainder of the tax due. *Ruth*, 823 F.2d at 1093. Employment taxes are considered divisible taxes. *Boyd v. Comm'r of Internal Revenue*, 451 F.3d 8, 12 (1st Cir. 2006); *Korobkin*, 988 F.2d at 976.

The University argues that the "divisible tax doctrine" is incompatible with a failure-to-pay penalty and would potentially subject taxpayers to substantial penalties for challenging the assessment. It notes that a taxpayer who does not prevail in the refund suit is still subject to statutory interest, so the government would be fully compensated for the delay in payment. The University also points out that where a taxpayer has paid a divisible amount of an assessment, the government is precluded from levying on a taxpayer's property to collect unpaid portions pending resolution of the proceedings. 26 U.S.C. § 6331(I).

We recognize the University's concern that the divisible tax doctrine allows a taxpayer to gain access to the court to challenge an assessment but potentially penalizes the taxpayer who does not prevail. Statutory interest alone might be enough to compensate the gov-ernment for the delay, as well as to deter frivolous chal-

lenges without discouraging legitimate ones—but this was not the policy chosen by Congress. Failure-to-pay penalties are mandatory unless due to reasonable cause and not due to willful neglect. *Id.* § 6651(a)(3). The divisible tax doctrine is merely a jurisdictional tool to challenge an assessment in the district court. *Korobkin*, 988 F.2d at 976. Congress chose to protect taxpayers who had unpaid divisible portions from levy by the government while a refund suit was pending, § 6331(i), and though it could have made a similar choice for failure-to-pay penalties, it did not. The IRS properly imposed failure-to-pay penalties on the University.

## IV. Conclusion

We AFFIRM the district court's decision that the IRS properly assessed the University of Chicago for FICA taxes for contributions made pursuant to salary reduction agreements under ERIP and CRP. We also AFFIRM the court's determination that the University is liable for failure-to-deposit and failure-to-pay penalties.