# United States Court of Appeals for the Federal Circuit

---

**DIVERSIFIED GROUP INCORPORATED, JAMES HABER,**
*Plaintiffs-Appellants*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

---

2016-1014

---

Appeal from the United States Court of Federal Claims in No. 1:14-cv-00627-MMS, Judge Margaret M. Sweeney.

---

Decided: November 10, 2016

---

JASPER G. TAYLOR, III, Norton Rose Fulbright US LLP, Houston, TX, argued for plaintiffs-appellants. Also represented by RICHARD LEE HUNN.

FRANCESCA UGOLINI, Tax Division, United States Department of Justice, Washington, DC, argued for defendant-appellee. Also represented by IVAN CLAY DALE, GILBERT STEVEN ROTHENBERG, CAROLINE D. CIRAOLO, DIANA L. ERBSEN.

---

Before PROST, *Chief Judge*, NEWMAN and TARANTO, *Circuit Judges.*

PROST, *Chief Judge.*

Diversified Group Incorporated ("Diversified") and its president, James Haber, (collectively, "Appellants") brought this action against the United States, seeking a refund of payments made toward a federal tax penalty which the Internal Revenue Service ("IRS") assessed under 26 U.S.C. § 6707 for failure to comply with tax shelter registration requirements under 26 U.S.C. § 6111. The United States Court of Federal Claims ("Claims Court") held that it lacked jurisdiction over the case because Appellants did not comply with the full payment rule. For the reasons stated below, we affirm.

## BACKGROUND

The circumstances giving rise to this appeal are summarized in the Claims Court's decision, *Diversified Group, Inc. v. United States*, 123 Fed. Cl. 442 (2015). We provide information relevant to the issues on appeal here.

Between 1999 and 2001, Appellants sold two tax avoidance strategies to 192 of their clients: the Option Partnership Strategy ("OPS") and the Financial Derivatives Investment Strategy ("FDIS"). Each strategy involved a set series of transactions, which, when exercised by an individual client, would yield an artificial tax loss or deduction. Each client would contribute the initial amount to be invested in these transactions, as well as pay a fee of 3–4.5%. Diversified did not register any of these services as tax shelters.

The then-applicable version of 26 U.S.C. § 6111[1] required that "[a]ny tax shelter organizer shall register the

---

[1] This version of 26 U.S.C. § 6111 and the corresponding version of 26 U.S.C. § 6707, referenced below,

tax shelter with the Secretary (in such form and in such manner as the Secretary may prescribe) not later than the day on which the first offering for sale of interests in such tax shelter occurs." 26 U.S.C. § 6111(a)(1). Under § 6111(c)(1), a "tax shelter" was defined as:

> any investment— (A) with respect to which any person could reasonably infer from the representations made, or to be made, in connection with the offering for sale of interests in the investment that the tax shelter ratio for any investor as of the close of any of the first 5 years ending after the date on which such investment is offered for sale may be greater than 2 to 1, and
>
> (B) which is—
>
> (i) required to be registered under a Federal or State law regulating securities,
>
> (ii) sold pursuant to an exemption from registration requiring the filing of a notice with a Federal or State agency regulating the offering or sale of securities, or
>
> (iii) a substantial investment.

Section 6111(c)(4) defined a "substantial investment" as an investment where "(A) the aggregate amount which may be offered for sale exceeds $250,000, and (B) there are expected to be 5 or more investors."

---

were enacted on August 5, 1997 as part of the Taxpayer Relief Act of 1997, Pub.L. 105–34. They were repealed on October 22, 2004, when they were replaced with the American Jobs Creation Act of 2004, Pub.L. 108–357. Because the actions in question occurred before 2004, we will refer to the pre-2004 versions of § 6111 and § 6707.

Treasury Department regulations provided that "[r]egistration is accomplished by filing a properly completed Form 8264 with the Internal Revenue Service. The Internal Revenue Service will assign a registration number to each tax shelter that is registered." Temp. Treas. Reg. § 301.611-1T, A-1, A-47. When an investment qualified as a tax shelter because it was a "substantial investment" under § 6111(c)(1)(B)(iii), a separate Form 8264 needed to be filed for each "investment" that made up the "substantial investment" if the investment

> differ[ed] from the other investments in a substantial investment with respect to any of the following: (1) Principal asset, (2) Accounting methods, (3) Federal or state agencies with which the investment is registered or with which an exemption notice is filed, (4) Methods of financing the purchase of an interest in the investment, (5) Tax shelter ratio.

*Id.* at A-48. The regulations made clear that "[s]uch aggregated investments, however, are part of a single tax shelter." *Id.*

If a person failed to register a tax shelter under § 6111, they were subject to a penalty under 26 U.S.C. § 6707. Section 6707(a) provided in relevant part:

> (1) Imposition of penalty.—If a person who is required to register a tax shelter under section 6111(a)—
>
> (A) fails to register such tax shelter on or before the date described in section 6111(a)(1), or
>
> (B) files false or incomplete information with the Secretary with respect to such registration,
>
> such person shall pay a penalty with respect to such registration in the amount determined under paragraph (2) or (3), as the case may be. No penal-

ty shall be imposed under the preceding sentence with respect to any failure which is due to reasonable cause.

(2) Amount of penalty.—Except as provided in paragraph (3), the penalty imposed under paragraph (1) with respect to any tax shelter shall be an amount equal to the greater of—

(A) 1 percent of the aggregate amount invested in such tax shelter, or

(B) $500.

In 2002, the IRS began conducting a penalty audit, pursuant to § 6707, of Diversified for potential failures to register a tax shelter under § 6111. Eventually, on December 16, 2013, the IRS issued two "Notices of Proposed Adjustment" ("NOPAs") assessing penalties of $24,868,451 for failure to register OPS and $17,241,032 for failure to register FDIS, respectively. The penalties totaled $42,109,483. According to the IRS, OPS and FDIS each qualified as a "tax shelter" under § 6111 because the computed tax shelter ratio was greater than 2:1 and each was a "substantial investment" under § 6111(c)(4). The IRS calculated each penalty by, pursuant to § 6707(a)(2)(A), computing the "aggregate amount invested"[2] by each client, multiplying this number by 1%, and summing this result across clients. On January 16, 2014, the IRS reduced the amount due to $24,920,904 because the other $17,188,579 had been "[p]aid by [o]thers."

---

[2] The "aggregate amount invested" was calculated, generally speaking, by summing the amount that the client contributed to initiate the OPS or FDIS transactions and the fee it paid to Diversified. This methodology is not in dispute.

On February 28, 2014, Diversified made a payment of $15,500, which was the portion of the OPS penalty that it incurred from its dealings with a single client, Stanley Dziedzic, ($15,450) plus interest ($50). Haber made a payment of $18,370, which was the portion of the FDIS penalty that he incurred from his dealings with another client, Albert Kotite, ($18,310) plus interest ($60). They filed refund claims for each. The IRS denied these claims on April 10, 2014.

Appellants filed the instant action in the Claims Court on July 18, 2014, seeking refunds of the $15,500 and $18,370 payments. On August 26, 2015, the Claims Court dismissed the case under Rule 12(b)(1) of the Rules of the U.S. Court of Federal Claims, finding that it lacked jurisdiction because Appellants had failed to satisfy the "full payment rule," which, under Supreme Court precedent, requires that a person seeking a refund for a tax or penalty pay in full before filing suit. *Flora v. United States*, 362 U.S. 145, 177 (1960). The Claims Court reissued its opinion on September 29 to correct certain citations to statutory language.

Appellants timely appealed. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(3).

DISCUSSION

I

An initial question that we must address is how this appeal comes to us procedurally. The Claims Court issued its opinion on August 26 and entered judgment pursuant to this opinion on September 25. However, this opinion cited to the post-2004 versions of § 6111 and § 6707, instead of the pre-2004 versions which are applicable here. Accordingly, the Claims Court reissued its opinion with corrected citations (but no other changes) on September 29 and entered judgment the following day. However, just before it did this, on September 28, plain-

tiffs filed a notice of appeal on the Claims Court's original judgment. Appellants argue that this September 28 notice of appeal divested the Claims Court of its jurisdiction such that it did not have jurisdiction to vacate its original judgment and reissue its opinion.

We disagree with Appellants. "Ordinarily, the act of filing a notice of appeal confers jurisdiction on an appellate court and divests the trial court of jurisdiction over matters related to the appeal." *Gilda Indus., Inc. v. United States*, 511 F.3d 1348, 1350 (Fed. Cir. 2008). Nevertheless, under Rule 60(a) of the Rules of the U.S. Court of Federal Claims, a court "may correct a clerical mistake or a mistake arising from oversight or omission whenever one is found in a judgment, order, or other part of the record." A court can make these corrections "on its own" and "without notice," even after a party has appealed. *See id.* The only constraint is that, "after an appeal has been docketed in the appellate court and while it is pending, such a mistake may be corrected only with the appellate court's leave." *Id.*

Here, Appellants are technically correct that their September 28 notice of appeal divested the Claims Court of its jurisdiction. Nevertheless, the Claims Court still remained able to issue clerical corrections to its opinion, and it did not need to seek our permission to do so until this appeal was docketed, which did not happen until October 6. The only correction the reissued opinion made was substituting the current versions of § 6111 and § 6707 with their pre-2004 versions, and this substitution did not impact the Claims Court's legal analysis. As such, the corrections were sufficiently separated from the Claims Court's substantive analysis to be considered clerical error. *Cf. Pfizer Inc. v. Uprichard*, 422 F.3d 124, 130 (3d Cir. 2005) ("[T]he relevant test for the applicability of Rule 60(a) is whether the change affects substantive rights of the parties and is therefore beyond the scope of Rule 60(a) or is instead a clerical error, a copying or

computational mistake, which is correctable under the Rule." (quoting *In re W. Tex. Mktg.*, 12 F.3d 497, 504 (5th Cir. 1994))); *Vaughter v. E. Air Lines, Inc.*, 817 F.2d 685, 689 (11th Cir. 1987) ("As a general proposition, the district court may act under Rule 60(a) only to correct 'mistakes or oversights that cause the judgment to fail to reflect what was intended at the time of the trial.' Corrections or alterations that 'affect the substantial rights of the parties, however, are beyond the scope of rule 60(a).'" (citations omitted)). As such, we have jurisdiction over this case, triggered by Appellants' September 28 notice of appeal, and we will consider the Claims Court's reissued opinion, which it properly corrected pursuant to Fed. R. Civ. P. 60(a).

## II

We now turn to the Claims Court's dismissal of Appellants' refund suit under Rule 12(b)(1) of the Rules of the U.S. Court of Federal Claims. We review a decision by the Claims Court to dismiss a case for lack of subject matter jurisdiction de novo. *Bianchi v. United States*, 475 F.3d 1268, 1273 (Fed. Cir. 2007). Appellants bear the burden of establishing that the court has jurisdiction by a preponderance of evidence. *Trusted Integration, Inc. v. United States*, 659 F.3d 1159, 1163 (Fed. Cir. 2011). "In determining jurisdiction, a court must accept as true all undisputed facts asserted in the plaintiff's complaint and draw all reasonable inferences in favor of the plaintiff." *Id.*

The sole basis for Appellants' appeal is that the Claims Court should have found that their § 6707 penalties were divisible, such that Appellants' payments of the Dziedzic and Kotite portions would have satisfied the full payment rule and allowed the Claims Court to exercise jurisdiction (assuming no other jurisdictional barriers). Based on our review of the full payment rule and its

divisibility exception, we disagree that the § 6707 penalties assessed against Appellants are divisible.

## A

In general, a person can challenge a penalty assessed by the IRS in two ways:  First, they can appeal to the IRS Appeals Office without paying the penalty.[3]  26 C.F.R. §§ 601.106(b), 601.105(b), (c), (e).  Second, they can pay the penalty, request a refund from the IRS, and, if unsuccessful, sue to recover a refund.  26 U.S.C. § 7422(a); 28 U.S.C. § 1346(a); *Smith v. United States*, 495 F. App'x 44, 48 (Fed. Cir. 2012).  Although the United States, as a sovereign, is generally immune from suit, 28 U.S.C. § 1346(a) provides the limited waiver of sovereign immunity for refund suits:

---

[3]    For taxes assessed by the IRS, a person also has the option of filing a petition with the United States Tax Court ("Tax Court") without first paying the tax.  *See Flora*, 362 U.S. at 163.  The Tax Court, however, is a court of limited jurisdiction, *see* 26 U.S.C. § 7442, and Congress has generally declined to authorize jurisdiction over assessed penalties, such as the § 6707 penalties at issue here.  *See* IRM 35.1.1.2 (listing statutory provisions under which the Tax Court has been granted jurisdiction, including 26 U.S.C. §§ 6015(e), 6110(f)(3), 6211–16, 6226, 6228, 6247, 6252, 6320, 6330, 7481(c), 6404(i), 7430(f)(2), 6512(b)(2), 6166, 6863(b)(3)(C), 7429(b)(2)(B)); *see also Smith v. Comm'r*, 133 T.C. 424, 430 (2009) (noting that "this Court has never exercised jurisdiction over an assessable penalty that was not related to a deficiency, even absent Congress' explicitly circumscribing our jurisdiction" and finding that the Tax Court did not have jurisdiction over penalties assessed under 26 U.S.C. § 6707A).

(a) The district courts shall have original jurisdiction, concurrent with the United States Court of Federal Claims, of:

(1) Any civil action against the United States for the recovery of any internal-revenue tax alleged to have been erroneously or illegally assessed or collected, or any penalty claimed to have been collected without authority or any sum alleged to have been excessive or in any manner wrongfully collected under the internal-revenue laws . . . .

The Tucker Act, which gives the Claims Court jurisdiction over suits for which the United States has waived its sovereign immunity, provides the Claims Court with jurisdiction for refund suits. 28 U.S.C. § 1491; *Shore v. United States*, 9 F.3d 1524, 1525 (Fed. Cir. 1993); *Rocovich v. United States*, 933 F.2d 991, 993 (Fed. Cir. 1991).

In *Flora*, the Supreme Court determined that § 1346(a)'s jurisdictional grant includes a "full payment requirement," which demands—as a jurisdictional prerequisite—full payment of the tax or penalty before a party could sue for a refund. 362 U.S. at 177 ("[Section] 1346(a)(1), correctly construed, requires full payment of the assessment before an income tax refund suit can be maintained in a Federal District Court."). It did, however, recognize that in cases such as those involving excise taxes where the tax "may be divisible into a tax on each transaction or event," satisfaction of "the full-payment rule would probably require no more than payment of a small amount." *Id.* at 171 n.37, 176 n.38. This is because each excise tax is, legally, its own assessment (e.g., if a person is taxed $100 per widget for 5000 widgets, they receive 5000 different assessments), so paying the "small amount" that is the excise tax for one good would satisfy the full payment rule for that good. *See id.*

This observation forms the basis for what courts have recognized as the "divisibility exception" to *Flora*'s full

payment rule. If an assessment or penalty is merely "the sum of several independent assessments triggered by separate transactions,"[4] *Korobkin v. United States*, 988 F.2d 975, 976 (9th Cir. 1993), it is considered "divisible" such that "the taxpayer may pay the full amount on *one transaction*, sue for a refund for that transaction, and have the outcome of this suit determine his liability *for all the other, similar transactions*." *Cencast Servs., L.P. v. United States*, 729 F.3d 1352, 1366 (Fed. Cir. 2013) (quoting *Univ. of Chi. v. United States*, 547 F.3d 773, 785 (7th Cir. 2008)). In practice, the government will generally counterclaim for the remainder of the tax due and both the paid assessment and the unpaid assessments will be litigated in one action. *Univ. of Chi.* 547 F.3d at 785; *Ruth v. United States*, 823 F.2d 1091, 1093 (7th Cir. 1987); Oral Argument at 12:22–47, *available at* http://oralarguments.cafc.uscourts.gov/default.aspx?fl=20 16-1014.mp3. If the government does not counterclaim, the challenger remains free to litigate the paid assessment as a test case.[5]

Nevertheless, divisibility remains a "narrow exception," *Korobkin*, 988 F.2d at 976, applied when an as-

---

[4] We have also stated that "[a] divisible tax . . . is one that represents the aggregate of taxes due on multiple transactions (e.g., sales of items subject to excise taxes)." *Rocovich*, 933 F.2d at 995.

[5] At oral argument, Appellants posited that, in this scenario, issue preclusion may be available as a way to expediently dispose of the remaining assessments. Oral Argument at 12:51–13:58. Of course, in this scenario, the full payment rule would still require that the challenger pay before they could challenge these assessments in subsequent refund suit(s). We provide no opinion on this approach generally, or whether issue preclusion would be available to Appellants in this case.

sessed tax or penalty is the aggregate of independent tax liabilities arising from different transactions. *See, e.g.*, *Cook v. United States*, 32 Fed. Cl. 170, 172 (1994) (recognizing that excise tax on sales of diesel fuel and environmental tax on importation of petroleum products are divisible by sale), *aff'd*, 86 F.3d 1095 (Fed. Cir. 1996); *Cencast Servs.*, 729 F.3d at 1357 (acknowledging that payroll taxes are divisible by employee). Where the liability is singular—even if the penalty base involves summing multiple figures—the assessment is not divisible. *See, e.g.*, *Rocovich*, 933 F.2d at 995 (estate tax not divisible because "it arises from a single event"); *Korobkin*, 988 F.2d at 977 (pre-1990 § 6700 penalty for failure to register abusive tax shelter not divisible because it was "based on the aggregate of a person's abusive tax shelter sales during the year" and not "assessed on each individual transaction"); *Ardalan v. United States*, 748 F.2d 1411, 1414 (10th Cir. 1984) (personal income tax not divisible).

## B

In this case, Appellants contend that their § 6707 penalties are divisible because they were assessed against each of the 192 instances[6] in which they implemented OPS or FDIS for an individual client. In effect, Appellants argue that this case involves 192 different tax shelters which § 6111 required them to register. In support of their position, Appellants emphasize that a separate Form 8264 (the form by which a tax shelter is registered, Temp. Treas. Reg. § 301.611-1T, A-1, A-47) would need to be filled out for each of the 192, as it is

---

[6] The attachments to the NOPAs list 193 total client entries. However, one client is unnumbered and two entries that are numbered do not list corresponding clients, so the correct total is 192. Neither party appears to dispute this point.

impossible to know all of the information that this form requires until OPS or FDIS is implemented for a particular client. Appellants also point out that the IRS computed the penalty amount—under the applicable portion of § 6707(a)(2), "1 percent of the aggregate amount invested in such tax shelter"—by computing the "aggregate amount invested" for each client implementation and summing. Accordingly, Appellants argue, § 6707 penalties should be divisible on this basis.

The government takes a different view. In its view, this case involves not 192 tax shelters, but two: OPS and FDIS. The government argues that, with respect to each of these offerings, the § 6707 penalty is not divisible because liability is triggered by a single event: failure to register the tax shelter. The government emphasizes that, under the plain language of § 6111(a)(1) and Treasury Department regulations, tax shelters must be registered by the first day that interests in the shelter are offered for sale (e.g., in this case, OPS and FDIS had to be registered by the first day Appellants offered them to its clients), and failure to do so—regardless of how many sales are made with respect to that tax shelter—triggers the § 6707 penalty. The government also counters that neither aggregating transactions to calculate the penalty nor filing separate Forms 8264 makes the § 6707 penalty divisible, because the first is only a method of quantifying liability (but does not trigger liability itself) and the second elevates form over substance.

We agree with the government. Section 6707(a) provides that "if a person . . . fails to register such tax shelter . . . such person shall pay a penalty with respect to such registration." This language makes clear that liability for a § 6707 penalty arises from the single act of failing to register the tax shelter (which, under Temp. Treas. Reg. § 301.611-1T, A-1, A-47, is failing to file the necessary Form(s) 8264). This omission creates a single source of liability, regardless of how many individuals or transac-

tions are involved in the tax shelter. Liability cannot be sub-divided beyond this.

This same principle holds for tax shelters—such as the ones at issue—that qualify as such because they are "substantial investments" under § 6111(c)(1)(B)(iii). Section 6111(c)(4) defines a "substantial investment" as an investment where "(A) the aggregate amount which may be offered for sale exceeds $250,000, and (B) there are expected to be 5 or more investors." Although the "substantial investment" is the aggregation of several transactions that involve multiple people (individually or collectively), the statutory language makes clear that it is this aggregation that qualifies as a single "tax shelter." Section 6111(c)(1) states that "the term 'tax shelter' means any investment . . . which is . . . a substantial investment," and § 6111(c)(4) states that "[a]n investment is a substantial investment if [it meets the criteria quoted above]." Reading these provisions together, it is clear that "tax shelter" refers to the aggregate "substantial investment," not the individual transactions that comprise it. Accordingly, it is the entire "substantial investment" that must be registered as a "tax shelter" under § 6111, and the point at which a tax shelter organizer fails to do this is when § 6707 liability arises.

Corresponding regulations accord with this understanding. Temp. Treas. Reg. § 301.611-1T, A-48, which governs the registration of "a tax shelter that is a substantial investment only by reason of an aggregation of multiple investments," states that a separate Form 8264 may need to be filed for each individual investment in certain circumstances (specifically, when the investment varies with respect to: "(1) Principal asset, (2) Accounting methods, (3) Federal or state agencies with which the investment is registered or with which an exemption notice is filed, (4) Methods of financing the purchase of an interest in the investment, [and/or] (5) Tax shelter ratio"). However, it is clear that, even in that case, "[s]uch aggre-

gated investments . . . are part of a single tax shelter." *Id.* Accordingly, the regulations contemplate that a "substantial investment" comprised of multiple "investments" still constitutes a single "tax shelter" that must be registered as one. Even if registration required filing multiple forms, registration is still a singular act. The only difference is the amount of paperwork necessary.

Accordingly, because, in either case, liability "arises from a single event"—the failure to register a tax shelter—§ 6707 penalties are not divisible into the individual transactions or investors that may comprise a single tax shelter. *Rocovich*, 933 F.2d at 995.

The only question that remains, then, is what qualified as a "tax shelter" in this case such that, when Appellants failed to register it, they incurred § 6707 liability. On this point, the parties differ substantially: Appellants contend that each of the 192 instances in which they implemented OPS or FDIS for a given client is a "tax shelter," whereas the government contends that OPS and FDIS are each a "tax shelter," and the instances in which Appellants carried these out for various customers were simply "interests" in those shelters.

The language of the statute answers this question. Section 6111(c)(1) simply states that a "tax shelter" is "any investment," with no other qualifiers as to the types of financial instruments that count as "investments." Read in isolation, this language may be ambiguous: "investment" could refer to a plan or strategy that clients put money into (such as OPS or FDIS), an individual instance of that plan or strategy implemented for a particular client (such as the Dziedzic and Kotite transactions), or the actual money that was put into the plan (such as the $15,450 that Dziedzic invested with OPS or the $18,310 that Kotite invested with FDIS).

However, the context in which this term appears makes it clear that Congress intended "tax shelter" to

refer to the first.  Section 6111(a)(1) requires that "[a]ny tax shelter organizer shall register the tax shelter . . . not later than the day on which the first offering for sale of interests in such tax shelter occurs."  If "tax shelter" was intended to refer to an individual implementation of a tax avoidance strategy instead of the tax avoidance strategy itself, it is hard to understand how one could register it "not later than the day on which the first *offering* for sale of interests."  § 6111(a)(1) (emphasis added).  This is because there would be no period of time for which the "tax shelter" would be "offered" but not already sold—it would have come into existence when it was implemented for a specific client, but at that point it would have already been sold.  In addition, interpreting "tax shelter" to mean only the individual implementation of a tax avoidance strategy would allow tax shelter organizers to freely market tax avoidance services—potentially for substantial periods of time—without having to disclose anything to the IRS until a first client purchases these services.  Congress could not have intended such a result.  Instead, a better interpretation for "tax shelter" is that it refers to the tax avoidance strategy itself, such that, when a tax shelter organizer first offers the strategy to clients (e.g., in this case, when Appellants first offered OPS or FDIS to clients), the duty to register the tax shelter under § 6111 triggers.  Accordingly, we agree with the government that, in a case like this where a specific tax avoidance strategy was marketed and uniformly implemented for multiple customers, "tax shelter" is broad enough to cover the tax avoidance strategy itself.

For these reasons, OPS and FDIS each qualify as a single "tax shelter" within the meaning of § 6111 and § 6707.  Accordingly, Appellants were required under § 6111 to register each of these strategies on the first day that they offered them for sale, and their failure to do so gave rise to their § 6707 penalties.  Because each of the

OPS and FDIS penalties "ar[ose] from a single event," they are not divisible. *Rocovich*, 933 F.2d at 995.

C

In light of this reasoning, Appellants' arguments to the contrary are not persuasive. Appellants contend that it would have been impossible to fill out a Form 8264 for all of OPS or all of FDIS on the first day they were offered for sale because many of the details that the form requires would be unknown. Instead, according to Appellants, they would have needed to file a new Form 8264 each time they implemented one of these strategies for a client, so each of these filings should be considered separate instances of tax shelter registration under § 6111. We disagree. The fact that Appellants may have needed to file multiple Forms 8264 to keep the government apprised of their tax shelter activities does not override the clear statutory directive on the source of § 6707 liability. Even though "[r]egistration is accomplished by filing a properly completed Form 8264 with the Internal Revenue Service," Temp. Treas. Reg. § 301.611-1T, A-1, § 6707 is clear that what determines § 6707 liability is registration, not the completion of a form. In many cases, there will be a 1:1 correspondence between the two such that a failure to file Form 8264 is a failure to register. However, in the case of "substantial investments" (such as OPS and FDIS) where multiple forms must be filed,[7] filing multiple

---

[7] As discussed above, under Temp. Treas. Reg. § 301.611-1T, A-48, a separate Form 8264 may need to be filed for each individual investment in a tax shelter that qualifies as a "substantial investment" "only by reason of an aggregation of multiple investments" when the investment varies with respect to: "(1) Principal asset, (2) Accounting methods, (3) Federal or state agencies with which the investment is registered or with which an exemption notice is filed, (4) Methods of financing the

forms for multiple investments still effects a single registration for a single tax shelter. Temp. Treas. Reg. § 301.611-1T, A-48 ("[s]uch aggregated investments, however, are part of a single tax shelter"). Accordingly, simply because the regulations require multiple forms does not mean that there are multiple sources of liability in these instances.

Appellants also argue that the § 6707 penalty is divisible because the penalty base was computed by summing the "aggregate amount invested" for each client implementation. This consideration is irrelevant. This process of aggregation simply calculates penalty amount—it does not create multiple liabilities under § 6707. Because the liability remains singular, the § 6707 penalty is not divisible.

We have carefully considered Appellants' remaining arguments and find them unpersuasive. In sum, because Appellants' § 6707 liability arises from their failure to register OPS and FDIS as tax shelters—two singular events—their § 6707 penalties are not divisible into the individual transactions or investors that participated in OPS or FDIS. Accordingly, Appellants failed to satisfy the full payment rule, precluding the Claims Court from exercising jurisdiction over their complaint.

CONCLUSION

For the foregoing reasons, we affirm the Claims Court's dismissal for lack of subject matter jurisdiction.

**AFFIRMED**

---

purchase of an interest in the investment, [and/or] (5) Tax shelter ratio."