# United States Court of Appeals for the Federal Circuit

---

**CENCAST SERVICES, L.P., CENEX SERVICES, L.P., DISC ACQUISITION CORP., DISC MANAGEMENT SERVICES GROUP, INC., DISC TALENT GROUP, INC., EP MANAGEMENT SERVICES, L.P., EP PRODUCTION SERVICES, L.P., EP TALENT SERVICES, L.P., PIXPAY SERVICES, L.P.,** AND **SCREENPAY, INC.,**
*Plaintiffs-Appellants,*

**v.**

**UNITED STATES,**
*Defendant-Appellee.*

---

2012-5142, -5143, -5144, -5145, -5146, -5147, -5148, -5149, -5150, -5151

---

Appeals from the United State Court of Federal Claims in consolidated Nos. 02-CV-1916, 02-CV-1917, 02-CV-1918, 02-CV-1919, 02-CV-1920, 02-CV-1921, 02-CV-1922, 02-CV-1923, 02-CV-1924, and 02-CV-1925, Judge George W. Miller.

---

Decided: September 10, 2013

---

KENT A. YALOWITZ, Arnold & Porter, LLP, of New York, New York, argued for plaintiffs-appellants. With him on the brief was MAXWELL C. PRESTON.

PATRICK J. URDA, Attorney, Tax Division, United States Department of Justice, of Washington, DC, argued for defendant-appellee. With him on the brief were KATHRYN KENEALLY, Assistant Attorney General, TAMARA W. ASHFORD, Deputy Assistant Attorney General, and GILBERT S. ROTHENBERG, Attorney.

ELIZABETH ROSENFELD, Wohlner Kaplon Phillips Young & Cutler of Encino, California, for amicus curiae Studio Transportation Drivers, Union No. 399 of the International Brotherhood of Teamsters.

DALE W. SHORT, Short & Shepherd of Westlake, Ohio, for amicus curiae International Alliance of Theatrical Stage Employees, et al.

REX S. HEINKE, Akin Gump Strauss Hauer & Feld LLP, of Los Angeles, California, for amicus curiae Alliance of Motion Picture and Television Producers. With him on the brief was JESSICA M. WEISEL.

———————————

Before NEWMAN, DYK, and PROST, *Circuit Judges.*

DYK, *Circuit Judge.*

In these consolidated tax refund cases, Cencast Services, L.P. et al. are entities that, inter alia, remit payroll and employment taxes on behalf of motion picture and television production companies. For convenience we refer to these entities in the singular as "Cencast." Cencast appeals from a final judgment of the United States Court of Federal Claims ("Claims Court") rejecting its claims for tax refunds. We hold that the scope of Cencast's liability for employment taxes under the Federal Unemployment Tax Act ("FUTA") and the Federal Insurance Contribution

Act ("FICA") is determined by reference to the employees' "employment" relationships with the common law employers for which Cencast remits taxes (i.e., the production companies), and that the common law employers cannot decrease their liability by retaining entities such as Cencast to actually make the wage payments to the employees. We also hold that Cencast is barred from raising its theory that it overpaid the FUTA and FICA taxes because some of the individuals classified as employees were independent contractors. We affirm.

BACKGROUND

The evolution of the motion picture and television industries over the past century has resulted in this tax case concerning FUTA and FICA tax liability. In the early part of the twentieth century, motion picture productions were primarily controlled by large, major motion picture and television studios, and production workers enjoyed long-term, continuous employment relationships with those studios. These studios paid wages to these employees, and, as the common law employers of these workers, were liable for employment taxes on those wages, and remitted those taxes directly to the Internal Revenue Service ("IRS").

Since the late 1970s, however, many smaller production companies have emerged and have created movies and television programs independently from the large studios. As a result of this trend, many production workers are now employed by several different production companies during the course of a year, rather than by a single large production studio. Thus, in any given year, a given production worker might earn wages from several production companies, all of whom (being common law employers) would be individually liable for employment taxes on those wages. The complex web of production companies and production workers that evolved made administration of payroll, benefits, collective bargaining agreements, and taxes increasingly difficult.

Entities like Cencast, which are also known as payroll service companies ("Service Companies"), emerged to address these problems. Over the last twenty-five years, virtually all independent production companies have contracted with Service Companies for payroll and related services. Cencast and other Service Companies compute and pay compensation to production workers, report and pay compensation to multi-employer pension and benefit funds, provide post-production financial reporting, and pay employment taxes to the IRS.

Although they contract with the Service Companies, production companies both hire and supervise the individual production workers—as they had done in the pre-Service Company era. In general, Cencast and other Service Companies have no role in selecting or supervising production workers. The only change is that entities like Cencast—and not the production companies—now pay the production workers and administer the production companies' payroll and employment tax obligations. It is undisputed in this case that Cencast is not the common law employer of production workers.

Around the time that Service Companies such as Cencast began to emerge, the Supreme Court decided *Otte v. United States*, 419 U.S. 43 (1974), which involved the question of whether entities who are not the common law employers (but nonetheless pay wages to the employees) are required, inter alia, to withhold the employees' portion of the FICA tax. *See id.* at 49-51. That question arose in the context of the payment of wages by a bankruptcy trustee on behalf of a bankrupt common law employer. *See id.* at 45-46. The Court held that persons who formally pay the wages of employees (called "statutory employers") are liable for the withholding of FICA taxes under I.R.C. § 3102(a), even where those persons were never in a common law employment relationship with those employees. *See id.* at 50-51. While *Otte* dealt only with the employee's portion of FICA, it is accepted that *Otte* applies equally to the employer's FUTA and FICA tax obligations.

*See Winstead v. United States*, 109 F.3d 989, 991 (4th Cir. 1997) (applying *Otte* to FUTA); *In re Armadillo Corp.*, 561 F.2d 1382, 1386 (10th Cir. 1977) (applying *Otte* to FUTA and to the employer's portion of FICA).

Under *Otte*, because Cencast and the other Service Companies pay the production workers, they are required to remit taxes imposed on employers and employees under FUTA and FICA. Only the employer's FUTA and FICA tax obligations are at issue here.

Between 1991 and 1996, Cencast paid over $7 billion in wages, on behalf of production companies, to hundreds of thousands of workers who worked on numerous different productions. Cencast also filed tax returns and remitted FUTA and FICA taxes to the federal government with respect to these employees. For the six tax years in question, Cencast remitted approximately $465 million in FUTA and FICA taxes as the employer contribution for the production worker employees.

When Cencast filed its FUTA and FICA employment tax returns, it treated each employee as being in an "employment" relationship with Cencast rather than with the production companies. This reduced the overall tax payments because of statutory caps on both FUTA and FICA taxes. Though both FUTA and FICA tax "all remuneration for employment," *see* I.R.C. § 3306(b) (FUTA); I.R.C. § 3121(a) (FICA), they both place caps on the wages subject to the tax. Under FUTA, each employer is only liable to pay taxes on the first $7,000 of wages paid "with respect to employment," *see* I.R.C. § 3306(b)(1), and under FICA, each employer is only liable to pay taxes on wages paid "with respect to employment" up to a specified FICA wage base, *see* I.R.C. § 3121(a)(1) (excluding from FICA's definition of wages remuneration above "the [FICA] contribution and benefit base (as determined under section 230 of the Social Security Act)"). The FICA wage base varies by year. The relevant FICA wage base for 1996, for example, was $62,700. Thus, if employee A earned $50,000 from production company 1 and $50,000

from production company 2, Cencast paid FUTA tax on only $7,000 of wages instead of $14,000, and paid FICA tax on only $62,700 in wages instead of $100,000 (for the 1996 tax year). Thus, applying a single wage cap in calculating its taxable wages for both FUTA and FICA purposes, Cencast excluded a portion of the production workers' wages from employment taxes. The amount of tax that was avoided is exactly equal to the additional amounts of FUTA and FICA tax that individual production companies would have been liable for had those companies conducted their own payroll services and filed their own tax returns.

In 1994, the IRS began investigating Cencast's FUTA and FICA tax calculation practices. Eventually, the IRS issued Technical Advice Memorandum ("TAM") 119980-97. *See* IRS Tech. Adv. Mem. 119980-97, *available at* http://www.irs.gov/pub/irs-wd/9918056.pdf. In the TAM, the IRS explained that FUTA and FICA taxes should be calculated as though each employee were in an employment relationship with each individual production company, rather than with Cencast. Thus, the TAM concluded that Cencast could not treat itself as being in an "employment" relationship with production workers (i.e., apply a single wage cap) in calculating its tax liability for FUTA and FICA purposes. Instead, Cencast was required to apply a separate wage cap with respect to each production company that had an employment relationship with the production worker during that year. In 2001, the IRS assessed Cencast FUTA and FICA tax deficiencies for the 1991-1996 tax years totaling approximately $43.7 million for FUTA taxes and $15.6 million for FICA taxes.

In November 2001, Cencast paid divisible portions of the IRS assessments totaling $637,000, representing additional tax owed with respect to some (but not all) Cencast employees for each of the 1991-1996 tax years. These payments entitled Cencast to file a claim for refund. *See Flora v. United States*, 362 U.S. 145, 175 n.38 (1960). Cencast then filed refund claims with the IRS in

April 2002 alleging, inter alia, that Cencast should be treated as the "employer" for FUTA and FICA tax purposes, and that taxes should be calculated accordingly. After Cencast requested and received a notice of claim disallowance from the IRS in May 2002, Cencast filed suit in the Claims Court, where it raised claims that largely paralleled those raised in the administrative refund claim. Because Cencast had only made a partial payment of tax, the government raised counterclaims for the remaining, unpaid balances of the IRS's assessments with respect to the employees not covered by Cencast's original refund claim. Cencast, in its answers to these counterclaims, defended on the same grounds asserted in the initial refund claim.

In December 2003, the parties first filed motions for partial summary judgment on the issue of how to compute the statutory caps for FUTA and FICA. In September 2004, the Claims Court granted the government's summary judgment motion on this issue. *See Cencast Servs., L.P. v. United States* ("*Cencast I*"), 62 Fed. Cl. 159 (2004). It agreed with the government that "the Production Companies are to be considered the [production workers'] employers for purposes of calculating FICA and FUTA taxable wage bases." *Id.* at 165, 184.

After this ruling, the parties discussed settlement and discovery. Then, in an August 2008 status conference, Cencast argued for the first time that it was entitled to reduce its tax obligations because, in its view, it had erroneously overpaid FUTA and FICA taxes. This was so because some individuals for whom it paid tax were not employees but independent contractors. *Cencast Servs., L.P. v. United States* ("*Cencast II*"), 94 Fed. Cl. 425, 437 (2010). (Neither FUTA nor FICA taxes are imposed with respect to independent contractors. *See, e.g., Hathcock v. Acme Truck Lines, Inc.*, 262 F.3d 522, 525 (5th Cir. 2001).) According to the Claims Court, "[t]his was the first mention of [Cencast's] independent contractor theory in this litigation, which, at that time, had been pending for

approximately six years." *Cencast II*, 94 Fed. Cl. at 437. Indeed, neither Cencast's original complaint nor its administrative claim for refund attached to that complaint reference the independent contractor theory.

Meanwhile, in December 2008, the IRS issued a notice of levy and seized an additional $4.3 million from a Cencast affiliate (beyond the $637,000 Cencast had already paid to the IRS). Cencast filed administrative claims for refund of this $4.3 million. Cencast then moved to amend its complaint in the Claims Court in April 2010 to include allegations regarding both Cencast's purported independent contractor overpayments, as well as allegations pertinent to its claim for refund with respect to the additionally seized funds. *See Cencast II*, 94 Fed. Cl. at 437-38. In January 2010, the government filed a motion *in limine* to exclude the independent contractor theory from the case.

In September 2010, the Claims Court ruled on both the government's motion *in limine* and Cencast's motion for leave to amend. *See Cencast II*, 94 Fed. Cl. 425. As to the government's motion *in limine* on Cencast's independent contractor theory, the Claims Court considered the variance doctrine, which bars taxpayers from raising new issues relating to its tax claims unless "the [new] issue raised in court 'is derived from or is integral to the ground timely raised in the [initial] refund claim.'" *Id.* at 440 (quoting *Ottawa Silica Co. v. United States*, 699 F.2d 1124, 1139 n.6 (Fed. Cir. 1983)). The Claims Court held that "[t]he independent contractor theory [could not] be said to be 'fairly contained within the refund claim' [originally filed in 2001] and [wa]s [therefore] barred by the variance doctrine." *Cencast II*, 94 Fed. Cl. at 441 (citing *Blakley v. United States*, 593 F.3d 1337, 1342 (Fed. Cir. 2010)). The Claims Court considered and rejected Cencast's arguments that various exceptions to the variance doctrine applied, *see id.* at 441-47, and also held that, even if the variance doctrine had not barred the independent contractor theory, "the [c]ourt would nonetheless

[have] preclude[d] [Cencast] from injecting [the theory] into the litigation at th[at] point because it simply c[ame] too late," *id.* at 448-49. The Claims Court denied Cencast's motion to amend its complaint "to the extent that it s[ought] to add a claim for refund . . . based on the independent contractor theory," but allowed the motion in other respects. *Id.* at 450-53. The Claims Court entered an agreed-upon final judgment on September 4, 2012.

Cencast timely appealed. We have jurisdiction under 28 U.S.C. § 1295(a)(3). The relevant facts are undisputed. "We review the Claims Court's legal determinations *de novo.*" *Haddon Housing Assocs., Ltd. P'ship v. United States*, 711 F.3d 1330, 1337 (Fed. Cir. 2013).

DISCUSSION

I

We first consider whether the Claims Court erroneously held that, for purposes of calculating the FUTA and FICA wage base caps, the caps should be calculated as though employees were in an "employment" relationship with each of the individual production companies (the common law employers), rather than with Cencast (the statutory employer). We agree with the government that the wage caps should be calculated by treating the employees as being in employment relationships with the common law employers. It would be contrary to the statutory scheme to allow common law employers to reduce their liability by transferring the functions of wage administration to entities like Cencast.

We begin with FUTA. Section 3301 of the Internal Revenue Code imposes a tax "on every employer (as defined in section 3306(a)) . . . equal to [a percentage] of the total wages (as defined in section 3306(b)) paid by him during the calendar year (or portion of the calendar year) with respect to employment (as defined in section 3306(c))." I.R.C. § 3301. It is established that both the common law employer and the statutory employer (Service Company) are employers within the meaning of

Section 3301. *See* I.R.C. § 3306(a).[1] Though the parties appear to agree that the term "employer" as used under § 3301 refers to both common law employers and statutory employers, Cencast argues that liability is imposed only on the entities that control the payment of wages—i.e., those who have "paid" wages. Thus, if the common law employee retains an entity such as Cencast to formally make the payments, only Cencast is liable for the tax and therefore must be the relevant "employer" for purposes of both § 3301—imposing liability—and § 3306(b)(1)—defining the wage cap calculation. We assume—without deciding—that when a single entity controls the payment of wages (i.e., it formally makes the tax payments), that entity is the "employer" who has "paid" the "wages" or "remuneration" under FUTA.[2] But it does not follow that the caps are to be computed as though the "employment" of the employees was by Cencast and not by the multiple common law employers here (the production companies).

The definition of taxable "wages" for FUTA purposes in § 3306(b)(1), referring to the wage cap, excludes:

> that part of the remuneration [for employment] which, after remuneration ... equal to $7,000 *with respect to employment* has been paid to an

---

[1]  Section 3306(a) contains a statutory definition of employer, as well as a common law definition of employer. *See* I.R.C. § 3306(a)(1)(A) (employer can include any person who "during any calendar quarter in the calendar year or the preceding calendar year paid wages of $1,500 or more"); *id.* § 3306(a)(1)(B) (employer can include any person who "on each of some 20 days during the calendar year or during the preceding calendar year, each day being in a different calendar week, employed at least one individual in employment").

[2]  We make the identical assumption when discussing FICA below.

individual by an employer during any calendar year, is paid to such individual by such employer during such calendar year.

*Id.* § 3306(b)(1) (emphasis added). In other words, the wage cap is "equal to $7,000 [paid] with respect to employment." *Id.* It is therefore "employment," not "employer," that is the relevant term for the wage cap amount.

There can also be no doubt that "employment" under § 3306(b)(1) must refer to the common law employment relationship. The statute defines "employment" to include "any service, of whatever nature, performed after 1954 by an *employee for the person employing him* . . . within the United States." *Id.* § 3306(c)(A) (emphasis added). FUTA incorporates the FICA definition of "employee," *see id.* § 3306(i), which defines an "employee" in employment as "any individual who, *under the usual common law rules* applicable in determining the employer-employee relationship, has the status of an employee." I.R.C. § 3121(d)(2) (emphasis added). These references in the FUTA statute, therefore, consistently refer to employment in the common law sense, and the wage cap provision must therefore be calculated with respect to the employee's various common law employments during the calendar year. The "person employing" the "employee" under § 3306(c) is not the statutory employer, and the "employment" referenced in § 3306(b)(1) is not the relationship between the "employee" and the statutory employer but the relationship between the "employee" and his or her common law employers. The language of the statute is quite consistent with the view that the common law employers provide the "employment" (the remuneration for which is the measure of the statutory cap) even though the statutory employer is "an employer" that "paid" the remuneration.

Moreover, as the Ninth Circuit noted in *Blue Lake Rancheria v. United States*, 653 F.3d 1112, 1118 (9th Cir. 2011), "it is the common-law employment relationship that triggers the FUTA tax." *Blue Lake* reiterated that

*Otte* and its progeny "merely hold that a statutory employer has responsibility for reporting and remitting [FUTA and FICA] taxes; these cases do not change the fact that FUTA liability arises out of the common-law employment relationship." *Id.*[3] This case, like *Blue Lake*, involves provisions—the wage cap provisions—that are designed to exempt certain wages from tax, and we agree with *Blue Lake* that only common law employment is relevant to such exemptions. Here, given the undisputed common law employment relationship between the production companies and the production workers, it is the common law "employment" that governs in the wage cap computation, not the relationship of the employees to Cencast.[4] And there is no question here that remunera-

---

[3]    In *Blue Lake*, the Ninth Circuit declined to extend a statutory provision exempting from FUTA taxes wages that were earned for "services performed . . . *in the employ of* an Indian tribe," *see* I.R.C. § 3306(c)(7) (emphasis added), to wages earned through employment by other common law employers but remitted by a tribe acting as a statutory employer, holding that this specific exemption from taxable wages under FUTA only applied to common law Indian tribe employers. *See* 653 F.3d at 1114.

[4]    The term "employment" is perhaps ambiguous as to whether it refers to each employee's overall employer during the year or to employment with each individual "employing the employee." The Treasury Regulations—which are entitled to *Chevron* deference, *see Mayo Found. for Med. Educ. & Research v. United States*, __ U.S. __, __, 131 S. Ct. 704, 711-14 (2011)—make clear that the latter is the correct interpretation. *See, e.g.*, Treas. Reg. § 31.3306(b)(1)-1(a)(3) (noting that under FUTA, the wage cap applies "not to the aggregate remuneration paid by all employers with respect to employment performed [during a calendar year] after 1938, but instead to the remuneration paid during such calendar year by each employer with respect to employment"); *see also* Treas. Reg.

tion was "paid" by Cencast, making it liable for the FUTA taxes since Cencast paid all wages to the employees.

Under Cencast's theory, moreover, the statutory employer's tax liability is less than the aggregate liability of the production companies if they had paid the employees directly. Nothing in § 3306(b)(1) suggests that Congress intended that common law employers be given the option to choose a different wage cap (and effectively reduce the amount of their tax liability) depending on whether they chose to administer payroll themselves or to delegate that responsibility to another entity. Rather, Congress intended the wage cap calculation amount to be the same whether the Service Company or the production company paid the wages to the employees. Neither *Otte* nor the Court of Appeals cases following *Otte* in any way suggest that common law employers could reduce their tax liability by contracting with Service Companies to pay wages and remit taxes. Accordingly, the FUTA wage cap provision, when referring to the relevant "employments" for purposes of calculating the wage cap, must refer to common law employment relationships.

A similar issue arises with respect to FICA. FICA imposes taxes "on every employer . . . with respect to having individuals in his employ[] equal to [a] percentage[] of the wages (as defined in section 3121(a)) paid by him with respect to employment (as defined in section 3121(b))." I.R.C. § 3111(a). Moreover, the wage cap provision of FICA, defining the "wages" to be taxed under FICA, has

---

§ 31.3121(a)(1)-1(a)(3) (noting that under FICA, "[i]f during a calendar year the employee receives remuneration from more than one employer, the annual wage limitation does not apply to the aggregate remuneration received from all such employers, but instead applies to the remuneration received during such calendar year from each employer with respect to employment").

an identical structure to the corresponding FUTA provision. It excludes from the wages taxed under FICA

> that part of the remuneration [for employment] which, after remuneration . . . equal to the contribution and benefit base (as determined under section 230 of the Social Security Act) *with respect to employment* has been paid to an individual by an employer during the calendar year with respect to which such contribution and benefit base is effective, is paid to such individual by such employer during such calendar year.

I.R.C. § 3121(a)(1) (emphasis added). As with FUTA, Cencast argues that the "employer" used in calculating the FICA wage base should be the employer that pays the wages (here, the statutory employer), and the government argues that the common law employer should be treated as the employer. But again, even assuming that Cencast is the "employer" that has paid the "wages" or "remuneration," the computation of the wage cap is made with respect to common law "employment."

Again, the relevant term is "employment." The emphasis in FICA, as in FUTA, is on capping taxable wages paid "with respect to *employment.*" *Id.* (emphasis added). Employment, as in FUTA, is defined in FICA as "any service, of whatever nature, *performed . . . by an employee for the person employing him*," *id.* § 3121(b) (emphasis added), again suggesting a common law relationship. As in FUTA, FICA defines "employee" as "any individual who, *under the usual common law rules* applicable in determining the employer-employee relationship, has the status of an employee." *Id.* § 3121(d)(2) (emphasis added). Therefore, it is clear that the FICA statute refers to common law employment when it refers to the "employment" with respect to which FICA wages are capped. As with FUTA, it would not make sense to have a wage cap definition that varies depending on the entity that paid the wages to the employees, and the Treasury Regulations again make clear that employment is not defined by

reference to a single employer but rather by each individual employer employing the worker during the year. *See* Treas. Reg. § 31.3121(a)(1)-1(a)(3). Therefore, we hold that the wage base under FICA must be calculated by reference to common law employments.

Cencast argues that we cannot interpret the FUTA and FICA provisions such that "employer" has different meanings under the liability (§§ 3301 and 3111) and wage cap (§§ 3306(b)(1) and 3121(a)(1)) provisions. However, because calculation of the wage cap amount rests on the definition of "employment," rather than on the definition of "employer," we do not adopt inconsistent interpretations of the term "employer." For purposes of this case, we assume that both the liability and wage cap provisions refer to the "employer" who is responsible for withholding, calculating, and reporting taxes. But the cap is not calculated by treating the "employee" as having "employment" with the statutory employer but instead as having employment with the various entities that have entered into common law employment relationships with them.

Finally, Cencast appears to argue that the FUTA and FICA provisions should be given the same construction as the income tax withholding provisions of § 3401 of the Internal Revenue Code at issue in *Otte*, and that those provisions apply only to the statutory employer. Section 3401(d)(1) defines "employer" as the entity "having control of the payment of . . . wages" (here Cencast). I.R.C. § 3401(d)(1). But this definition does not apply "for purposes of subsection [3401](a)," which defines the "wages" subject to withholding. *See id.* Section 3401(d) makes clear that the wage computation of § 3401(a)—the equivalent of the wage caps here—does not refer to the wages paid by the entity that "control[s] . . . the payment of . . . wages," *see* § 3401(d), but rather to wages earned "for services performed by an employee for his employer," (i.e., common law employment). *Id.* § 3401(a). If § 3401(a) is viewed as similar to the wage cap provisions in FUTA and FICA, it supports our interpretation of those provisions.

Ultimately, as discussed above, the wage cap provisions under FUTA and FICA would make no sense if the wage caps were applied to the statutorily defined employment relationships, and not the common law employment relationships, because that would allow common law employers to reduce their tax liabilities by retaining entities like Cencast. This is a result Congress could not have intended.[5] Contrary to the views expressed by various amici, this result will not impair production companies' use of Service Companies like Cencast. If the Service Companies provide indispensable administrative services, as both amici and Cencast argue, we are convinced that production companies will continue to contract with Cencast, even if Cencast is liable for the same amount of tax as the common law employers would be in the event that they chose to make the wage payments directly. But whether or not this is the case, the argument that this liability should be reduced to encourage the use

---

[5]  Cencast's proposed disposition would also be contrary to the IRS's current guidance in the Internal Revenue Manual, which states:

Although a section 3401(d)(1) employer is liable for the payment of employment taxes, the determination of whether an employee has wages as defined by the FICA, FUTA, or [income tax withholding] provisions of the Internal Revenue Code is made by reference to the common law employer. Thus, if an employee has multiple common law employers during a calendar year, the section 3401(d)(1) employer must apply a separate FICA and FUTA wage base for each common law employer.

*See Field Collecting Procedures, Third-Party Payer Arrangements for Employment Taxes*, IRM 5.1.24.3.2.2 (Aug. 15, 2012), *available at* http://www.irs.gov/irm/part5/irm_05-001-024r.html.

of Service Companies is a matter for Congress, not this court.

## II

The second issue on appeal is the independent contractor issue, namely, whether Cencast can include in its refund suit a claim for taxes erroneously paid with respect to independent contractors. This claim was neither submitted to the IRS with Cencast's original refund claim nor originally asserted in the refund suit in 2003 nor asserted in Cencast's response to the government's counterclaims.

Cencast argues that it erroneously designated some production workers as "employees," (rather than as independent contractors) and that this resulted in an overpayment of tax. Cencast seeks to amend its pleadings to claim a tax refund on this theory. The government argues that Cencast's attempt to amend its pleadings to include the independent contractor theory in 2010 is barred. We agree with the Claims Court that Cencast's independent contractor theory is barred. *See Cencast II*, 94 Fed. Cl. at 438-49. We address Cencast's several arguments in turn.

## A

Cencast argues that, under Court of Federal Claims Rule 15(a),[6] it should have been permitted to amend its answer to the government's counterclaim to assert the independent contractor theory as an affirmative defense. There is no dispute that, when Cencast filed answers to the counterclaim in both 2003 and 2007, it failed to include the independent contractor theory.

---

[6] Though Cencast references Rule 15(b) as authority to amend its pleadings, we agree with the government that Rule 15(a) is the pertinent rule, since Rule 15(a) is the rule that applies to amendments sought pre-trial. Rule 15(b) applies to amendments made during and after trial. *See* Ct. Fed. Cl. R. 15(a),(b),

Though Rule 15(a), like the corresponding Federal Rule of Civil Procedure, is construed liberally to allow amended pleadings, and leave is to be "freely give[n] . . . when justice so requires," such amendments are not allowed where they result in undue delay or prejudice. *See* Ct. Fed. Cl. R. 15(a); *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 330-31 (1971) ("[I]n deciding whether to permit . . . an amendment, the trial court [i]s required to take into account any prejudice that [the non-movant] would have suffered as a result . . . ."); *Foman v. Davis*, 371 U.S. 178, 182 (1962) (citing "undue delay" and "undue prejudice to the opposing party" as reasons to deny leave to amend). Here, the Claims Court found that both undue delay and prejudice would result from Cencast's proposed amendments relating to the independent contractor theory.

Not only did Cencast's original complaint not reference the independent contractor issue, the government and Cencast had entered into a stipulation meant to define and narrow the relevant issues in the case as late as 2008. This stipulation did not mention the independent contractor theory. We agree that the amended pleading, coming two years later, would have been prejudicial to the government. As the Claims Court concluded, "[a]llowing [the] plaintiffs to introduce the independent contractor theory [in 2010] would [have] prejudice[d] [the government], which ha[d] already devoted significant resources to litigating the issues long recognized as raised by th[e] case." *Cencast II*, 94 Fed. Cl. at 448. Here, the Claims Court emphasized that injecting the theory into the litigation at a late stage would require new discovery, noting "the addition of the independent contractor theory would cause 'further factual disputes [and] substantial factual inquiry by [the parties].'" *Id.* at 449 (quoting *In re Bank of Am.*, 217 Ct. Cl. 731, 732 (1978)) (second alteration in the original). As the record shows, discovery on the independent contractor issue would have indeed been complex and time consuming, including requiring statistical sampling. Additional discovery would thus have been

burdensome and, contrary to Cencast's arguments, the government never acquiesced to such discovery.[7] It is clear that, "if the amendment [to a pleading] substantially changes the theory on which the case has been proceeding and is proposed late enough so that the opponent would be required to engage in significant new preparation, the court may deem it prejudicial." 6 Wright & Miller, Federal Practice and Procedure § 1487 (Apr. 2013); *see also Troxel Mfg. Co. v. Schwinn Bicycle Co.*, 489 F.2d 968, 971 (6th Cir. 1973) ("[T]o put [the non-moving party] through the time and expense of continued litigation on a new theory, with the possibility of new discovery, would be manifestly unfair and unduly prejudicial.").

Cencast's unreasonable delay after it became aware of the independent contractor issue—also emphasized by the Claims Court—only underscores the evident prejudice here. *See Cencast II*, 94 Fed. Cl. at 449 (noting that Cencast's attempt to amend to include the independent contractor theory "simply c[ame] too late"). Cencast was

---

[7]    After Cencast first raised the independent contractor theory before the Claims Court, discovery regarding the independent contractor issue was discussed at status conferences and other hearings, and some discovery began on the issue. The government objected to the discovery, noting that there would be "legal barriers" to Cencast's independent contractor theory, and sought to stay discovery pending resolution of its defenses to Cencast's independent contractor theory. *See* J.A. 2591. Any discovery undertaken by the government during the period between the government's objection to discovery and the Claims Court's ultimate decision to exclude the independent contractor theory was not voluntary. Rather, this discovery occurred because the Claims Court denied the government's motion to stay discovery pending its forthcoming decision on the motion to exclude the independent contractor theory from the case.

aware of its independent contractor theory as early as 1994. Nonetheless Cencast, without explanation, failed to raise the issue in a refund claim or pleading for over fifteen years. Here, Cencast could have sought leave to file its amended pleading at any point before February 23, 2007, the deadline the parties agreed to—and the court imposed—for adding new legal theories and affirmative defenses to the pleadings. This opportunity existed for nearly five years after the government brought its initial counterclaim on the entire tax assessment in 2003. Cencast's "failure to seek such leave, much less do so in a timely fashion, renders its purported [supplemental pleading] improper." *Rates Tech. Inc. v. Nortel Networks Corp*, 399 F.3d 1302, 1309-10 (Fed. Cir. 2005). And "[d]elay alone, even without a demonstration of prejudice, has thus been sufficient grounds to deny amendment of pleadings." *Te-Moak Bands of W. Shoshone Indians of Nev. v. United States*, 948 F.2d 1258, 1262 (Fed. Cir. 1991); *see also* 6A Charles Alan Wright et al., Federal Practice and Procedure § 1510, at 208-09 (2d ed. 1990) (noting that "supplemental pleading will not be permitted" where "the moving party is guilty of inexcusable delay").

We conclude that the Claims Court did not abuse its discretion in denying Cencast's motion to amend its complaint as to the independent contractor theory. *See Tamerlane, Ltd. v. United States*, 550 F.3d 1135, 1147 (Fed. Cir. 2008) ("'The decision to grant or deny a motion for leave to amend . . . lies within the sound discretion of the trial court.'" (quoting *Insituform Techs., Inc. v. CAT Contracting, Inc.*, 385 F.3d 1360, 1372 (Fed. Cir. 2004))).

Cencast next argues that its 2009 administrative refund claim (relating to the $4.3 million levy in 2008 which resulted in the seized funds) permitted supplementation of Cencast's pleading to include the independent contractor issue. There is no dispute that Cencast raised the independent contractor theory in the 2009 administrative claim that preceded its proposed amended complaint.

Cencast's argument seems to be that, because the IRS seized the additional $4.3 million in funds in 2008, leading to a new refund claim, Cencast was entitled to file a supplemental pleading raising the independent contractor theory. Cencast relies in part on Court of Federal Claims Rule 15(d), which gives the Claims Court discretion to, "on just terms, permit a party to serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented." *See* Ct. Fed. Cl. R. 15(d). Rule 15(d) further allows the court to "permit supplementation even though the original pleading is defective in stating a claim or defense." *Id.* As with Rule 15(a), the Court of Appeals "review[s] the denial of leave to supplement a complaint under [Rule 15(d)] for abuse of discretion." *See Schwarz v. City of Treasure Island*, 544 F.3d 1201, 1211 (11th Cir. 2008) (addressing Rule 15(d) of the Federal Rules of Civil Procedure).

Here, following Rule 15(d), the Claims Court allowed Cencast to supplement its complaint to (1) plead factual allegations surrounding the 2008 levy of funds; (2) plead an illegal exaction claim "assert[ing] a right to . . . return" of the seized funds; and (3) include the $4.3 million seized by the IRS in the relief it sought in its original refund claim (based on the legal theories originally raised). *See Cencast II*, 94 Fed Cl. at 451-52. These legal claims and facts resulted from the 2008 levy, and the Claims Court allowed these amendments because "[s]upplementation of pleadings should be allowed where post-commencement events are *material to the action*." *Id.* at 449 (emphasis added) (internal quotation marks omitted). However, the Claims Court did not allow Cencast to supplement its complaint to include new allegations relating to the independent contractor theory. *Id.* at 449-50. This ruling was entirely appropriate. In 2008, no new facts material to Cencast's independent contractor theory arose. The pertinent facts relate to the production workers' employment relationships with the production companies be-

tween 1991-1996, which remained unchanged as a result of the 2008 levy.

Moreover, Cencast's liability for the $4.3 million seized as a result of the levy had already been placed at issue in this case as a result of the government's counterclaims and as a result of Cencast's election to pay a divisible portion of the tax to determine its overall tax liability and commence a refund suit under I.R.C. § 7422(a). Even though the divisibility rule "'legally entitle[s a taxpayer] to make [a partial] payment . . ., to make [a] claim for refund, and to institute [a] suit for recovery,'" the rule is designed as a means of "'*settling the question* of the right of the government to have made [the entire tax] assessment against [the taxpayer].'" *See Boynton v. United States*, 566 F.2d 50, 52 (9th Cir. 1977) (emphasis added) (quoting *Steele v. United States*, 280 F.2d 89, 91 (8th Cir. 1960)). When a taxpayer sues for a refund based on a divisible refund claim, it is meant to "test the validity of *the entire assessment.*" *See Lucia v. United States*, 474 F.2d 565, 576 (5th Cir. 1973) (emphasis added)); *see also Univ. of Chi. v. United States*, 547 F.3d 773, 785 (7th Cir. 2008) (noting that, where a tax is divisible, "the taxpayer may pay the full amount on *one transaction*, sue for a refund for that transaction, and have the outcome of this suit determine his liability *for all the other, similar transactions*" (emphasis added) (quotation marks omitted)).

Moreover, Congress has recognized the representative nature of a divisible refund suit, foreclosing IRS levies "with respect to any unpaid divisible tax during the pendency of any [previously-filed refund] proceeding brought . . . in a proper Federal trial court" where "the decision in [a] [previously-filed] proceeding would be res judicata with respect to such unpaid tax" for the amounts not formally part of the refund suit. *See id.*

§ 6331(i)(1)(A).[8] We view this to be such a case. Thus, we are persuaded that the Claims Court did not abuse its discretion in declining to allow Cencast's independent contractor theory on the basis of the IRS's levy of $4.3 million. The "new facts" arising from the IRS levy did not compel the Claims Court to allow Cencast to plead "new issues" relating to the independent contractor theory.[9]

## B

Cencast finally argues that its original 2002 refund claim was sufficient to preserve the independent contractor theory. The Claims Court rejected this argument, concluding that it lacked jurisdiction over the independent contractor theory based on the so-called "substantial variance" rule. *See Cencast II*, 94 Fed. Cl. at 441-42. We described this rule in *Computervision Corp. v. United States*, 445 F.3d 1355 (Fed. Cir. 2006). As we explained in

---

[8]    The propriety of the levy in this case is not implicated by this provision because it only applies to "unpaid tax attributable to taxable periods beginning after December 31, 1998." Pub. L. 105-206, § 3433(b), 112 Stat. 685, 760 (1999).

[9]    *Allstate Ins. Co. v. United States*, 550 F.2d 629 (Ct. Cl. 1977), is not to the contrary. Although the Court of Claims allowed a taxpayer to assert an additional legal theory in a second refund claim in that case, both the first and second refund claims at issue were made within the initial statute of limitations period defined in § 6511(a). *See id.* at 635-36. Unlike *Allstate*, this case does not involve an amendment to the taxpayer's legal theories within the limitations period applicable to a taxpayer's initial refund claim. Rather, it involves allegedly "new facts" arising several years after the initial deficiency assessment and tax payment that, in Cencast's view, justify a separate refund claim, made outside the initial limitations period, raising new legal theories.

*Computervision*, "[t]he Secretary by regulation requires that claims for refund '*set forth in detail each ground* upon which a credit or refund is claimed and facts sufficient to apprise the Commissioner of the exact basis [of the refund claim].'" *Id.* at 1363 (quoting Treas. Reg. § 301.6402-2(b)(1)). This requirement "'is designed both to prevent surprise and to give adequate notice to the [IRS] of the nature of the claim and the specific facts upon which it is predicated, thereby permitting an administrative investigation and determination.'" *Computervision*, 445 F.3d at 1363 (quoting *Alexander Proudfoot Co. v. United States*, 454 F.2d 1379, 1383 (Ct. Cl. 1972)). Accordingly, new claims or theories raised subsequent to the initial refund claim are not permitted where they substantially vary from the theories initially raised in the original claim for refund. *See Computervision*, 445 F.3d at 1364 & n.8; *Lockheed Martin Corp. v. United States*, 210 F.3d 1366, 1371 (Fed. Cir 2000) ("[The] 'substantial variance' rule . . . bars a taxpayer from presenting claims in a tax refund suit that 'substantially vary' the legal theories and factual bases set forth in the tax refund claim presented to the IRS.").

The question here, as in other cases, is "whether there [wa]s a substantial variance from a timely filed claim." *See Computervision*, 445 F.3d at 1364 n.8 (citing *Lockheed*, 210 F.3d at 1371). There is no dispute that the independent contractor theory was not raised in Cencast's 2002 administrative refund claim. There is also no doubt that the independent contractor theory substantially varies from Cencast's original theory of the case (which was based on the wage cap issue discussed in Part I). However, Cencast argues that exceptions to the variance rule apply here.

1

Cencast first argues that the equitable recoupment doctrine is an exception to the variance rule that permits it to use its independent contractor theory to offset any recovery the government may receive on its counter-

claims. However, where the government files a counter-claim that places the entire balance of assessed tax in issue, we agree with the Claims Court that Cencast's right to assert a setoff with respect to the government's counterclaim recovery "exists only when the Government raises a new issue that the plaintiff could not have antici-pated and, therefore, could not have . . . asserted as grounds for its [original] refund [claim]." *Cencast II*, 94 Fed. Cl. at 441. The principle underlying equitable re-coupment, as articulated by the Ninth Circuit in a related context, is that "[i]t would be unfair to allow the Govern-ment to assert a new defense to a taxpayer's claim at pretrial and simultaneously to prevent the taxpayer from making appropriate responses to it, because the taxpayer had not previously anticipated the defense." *Brown v. United States*, 427 F.2d 57, 62 (9th Cir. 1970). However, where "the government does not raise a[] [new] offset issue . . . , a taxpayer could not raise any setoff." *Union Pac. R.R. Co. v. United States*, 389 F.2d 437, 447 (Ct. Cl. 1968).

This principle—that equitable recoupment only ap-plies when the government raises a new taxation theory in its counterclaims—is compelled by Supreme Court cases emphasizing that the doctrine applies where the government raises new and inconsistent theories of taxa-tion. *See United States v. Dalm*, 494 U.S. 596, 605 n.5 (1990) ("[W]e have emphasized that a claim of equitable recoupment will lie *only* where the Government has taxed a single transaction, item, or taxable event under *two inconsistent theories*." (emphases added)); *Rothensies v. Electric Storage Battery Co.*, 329 U.S. 296, 300 (1946) ("Whatever may have been said [in past cases] indicating a broader scope to the doctrine of recoupment, these facts are the only ones in which it has been applied by this Court in tax cases."); *Bull v. United States*, 295 U.S. 247 (1935) (permitting use of equitable recoupment defense where an executor initially paid an estate tax on certain funds, but the IRS subsequently treated the funds as taxable income of the estate). No new and inconsistent

theories were raised by the government in its counter-claims. Accordingly, the equitable recoupment exception is inapplicable.

2

Cencast next argues that the waiver doctrine saves its independent contractor theory. Under this doctrine, where "the taxpayer files a timely formal claim but fails to include the specific claim for relief [i.e., the independent contractor theory], th[at] claim may nonetheless be considered timely if the IRS considers that specific claim within the limitations period." *Computervision*, 445 F.3d at 1365. Under some circumstances, the IRS's consideration is viewed as resulting in a waiver. *See id.*; *see also Goulding v. United States*, 929 F.2d 329, 332 (7th Cir. 1991) (noting that waiver may occur "if the IRS has sufficient knowledge of the claim and makes a determination on the merits"). "The central purpose of the waiver doctrine is to prevent IRS agents from lulling taxpayers into missing the [limitations] deadline . . . ." *Computervision*, 445 F.3d at 1366 (alterations in the original) (quotation marks omitted). However, "the IRS cannot waive the requirements of its regulations by conduct outside of the limitations period." *Id.* at 1367.

Here, with respect to Cencast's 2002 administrative claim, the relevant limitations period expired in 2004. *See* I.R.C. § 6511(a) (noting that the statute of limitations for a refund claim expires at the later of two years from the date the tax is paid or three years from the date the return is filed). Thus, the IRS's consideration must have occurred no later than 2004 for this exception to apply. Cencast argues that the IRS considered the independent contractor issue during the investigative proceedings that preceded its 2001 assessment, but this argument is without merit. While Cencast, during the administrative investigation, alerted the IRS that there were questions as to the independent contractor status and possibility of refund claims with respect to those employees, Cencast did not suggest that the independent contractor theory

was a current issue, but merely that it was an issue that could be raised in the future. Cencast's submissions to the IRS during its investigation specifically stated that "the issue in the case at hand *is not* whether the workers are employees or independent contractors. [The taxpayer] has always treated the [production workers] as employees." J.A. 5488 (emphasis added). At the conclusion of the investigation, the IRS merely "accepted the determination that was made by the production companies and [Cencast]" that the production workers were common law employees. J.A. 10,775.

Here, it is clear that, before the expiration of the limitations period, the IRS neither "consider[ed]" nor made a "determination of the merits" as to the scope or nature of any independent contractor overpayment. *See Computervision*, 445 F.3d at 1365; *Goulding*, 929 F.2d at 332.

It is also clear that the IRS's actions here did not prevent Cencast from raising a timely administrative claim or lull it into missing a limitations deadline. *See Computervision*, 445 F.3d at 1365-67; *see also United States v. Memphis Cotton Oil Co.*, 288 U.S. 62, 64-66, 71 (1933) (finding waiver where the IRS, after initially concluding that a refund was due on a claim, reversed its position and determined that the initial claim was improperly filed, after the limitations period expired for filing a corrected claim); *Goulding*, 929 F.2d at 333 (finding waiver where the IRS had considered the merits of the taxpayer's claim based on an "in-depth investigation" it had performed on a related claim, and declined to challenge the sufficiency of the taxpayer's claim until two years after the original claim was filed). No aspect of the IRS's alleged "consideration" prevented Cencast from raising the independent contractor theory before 2004.

We agree with the Claims Court that, "[b]ecause [Cencast] did not assert the independent contractor status of [the] workers as a basis of [its] claim for refund and the

answer to that question was not implicitly included in the agency's audit investigation,"[10] the independent contractor status of employees was "beyond the scope" of what the IRS considered. *Cencast II*, 94 Fed. Cl. at 441. Thus, the waiver doctrine does not warrant further consideration of Cencast's independent contractor theory.

There is no exception to the substantial variance doctrine here that would permit Cencast to raise its independent contractor theory at this late date.

CONCLUSION

Because we conclude that Cencast has not shown its entitlement to a tax refund, we affirm the judgment of the Claims Court.

**AFFIRMED**

COSTS

Costs to the United States.

---

[10]    Cencast argued in its 2002 administrative claim that the IRS had misidentified the workers' common law employers. Now, on appeal, Cencast argues that assessment of this issue necessarily required the IRS to ascertain whether production workers were independent contractors or employees. However, as discussed above, the refund claims treated as settled fact that the production workers were employees. The issue was therefore not "implicitly included" in Cencast's claim, *see Cencast II*, 94 Fed. Cl. at 441.