FOR PUBLICATION

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

JAMES TARPEY,

*Plaintiff-Appellant,*

v.

UNITED STATES OF AMERICA,

*Defendant-Appellee.*

No. 22-35208

D.C. No. 2:17-cv-00094-BMM

OPINION

Appeal from the United States District Court
for the District of Montana
Brian M. Morris, District Judge, Presiding

Argued and Submitted April 12, 2023
Seattle, Washington

Filed August 17, 2023

Before: M. Margaret McKeown, Jay S. Bybee, and
Roopali H. Desai, Circuit Judges.

Opinion by Judge McKeown

# SUMMARY[*]

## Tax

The panel affirmed the district court's judgment imposing over $8 million in penalties against taxpayer for promoting a tax-avoidance scheme that involved charitable deductions claimed in connection with the donation of unwanted timeshares.

Taxpayer formed Project Philanthropy, Inc., d/b/a/ Donate for a Cause (DFC), a nonprofit with tax-exempt status that facilitated the donation of timeshares by timeshare owners. Taxpayer also formed Resort Closings, a for-profit service that handled the real estate closings for timeshares donated to DFC. Donors paid a donation fee to DFC and shouldered the timeshare transfer fees. Taxpayer, his sister, Ron Broyles, and Curt Thor appraised the value of the unwanted timeshares.

26 U.S.C. § 6700 imposes a penalty on promoters and others involved in the organization or sale of tax shelters if they make false statements or exaggerate valuation, in this case, in the form of timeshare appraisals. The panel upheld the district court's determination on summary judgment that taxpayer was liable for the appraisals of Broyles and Thor because, as a matter of law, taxpayer knew or had reason to know Broyles and Thor were disqualified as appraisers under the Treasury regulations, and taxpayer forfeited his

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

argument on appeal that he was unaware the appraisals would be imputed to DFC.

The panel next affirmed the district court's determination on summary judgment that the scope of the "activity" to be penalized under § 6700(a) encompassed taxpayer's entire timeshare donation business and not just the funds directly coming from the false statement appraisals.

Finally, the panel upheld the district court's judgment following a bench trial imposing over $8 million in penalties. The panel held that the district court properly relied on the Internal Revenue Code's general definition of gross income, which includes "all income from whatever source derived," 26 U.S.C. § 61(a), and properly included funds deposited into an escrow account managed by Resort Closings in calculating the penalties, because taxpayer had some guarantee that he would be allowed to keep the money in that account.

## COUNSEL

Sean T. Morrison (argued), Morrison Law Firm PLLC, Helena, Montana; Brian K. Gallik, Gallik Bremer & Molloy PC, Bozeman, Montana; for Plaintiff-Appellant.

Judith A. Hagley (argued) and Jacob E. Christensen, Attorneys, Tax Division/ Appellate Section; Jesse Laslovich, United States Attorney; Department of Justice, Washington, D.C.; for Defendant-Appellee.

# OPINION

McKEOWN, Circuit Judge:

Through Donate for a Cause, James Tarpey pitched an attractive offer to customers looking to get rid of timeshares: donate your unwanted property to us, we'll get it appraised, and you'll claim a charitable contribution deduction on your federal tax return. There was just one hitch. The timeshare donation business was really more of a bogus tax scheme. The Internal Revenue Service ("IRS") assessed penalties under 26 U.S.C. § 6700 for promoting an abusive tax shelter. The district court concluded that Tarpey was liable for the entirety of his timeshare donation scheme and, after a bench trial, ordered a penalty amount of $8.465 million plus interest.

Tarpey challenges a portion of the liability ruling and the district court's computation of his gross income for the penalty amount. Of broader significance, this case also calls on us to interpret § 6700 to address the scope of the "activity" for which a person is liable for making a false statement in furtherance of the tax-avoidance plan. We affirm.

## I. BACKGROUND

James Tarpey, a lawyer and businessman, formed Project Philanthropy, Inc. d/b/a/ Donate for a Cause ("DFC") around 2006. DFC facilitated the donation of timeshares for timeshare owners who no longer wanted to pay timeshare fees or otherwise wanted to dispose of their timeshare properties. Tarpey promised potential customers that they could receive generous tax savings from donating their unwanted timeshares to DFC. Tarpey himself appraised the

value of some of the properties donated to DFC, and other properties were appraised by his sister, Suzanne Tarpey, and real property appraisers Ron Broyles and Curt Thor.

Tarpey formed DFC as a nonprofit and obtained tax-exempt status from the IRS. He touted this arrangement as "the only way to get rid of an unwanted timeshare and still make some money." He served as the sole voting member. He also formed a for-profit timeshare closing service called Resort Closings that handled the real estate closings for timeshares donated to DFC. DFC and Resort Closings marketed the generous tax savings that a customer could gain by donating a timeshare. When a customer decided to donate an unwanted timeshare, DFC would accept the timeshare, and open a "closing file" with Resort Closings to handle the property closing and transfer. Donors paid a donation fee to DFC plus shouldered the timeshare transfer fees. DFC accepted at least 7,600 timeshare donations during the period at issue, 2010-2013.

## A. PRIOR INJUNCTION

In a prior proceeding, the United States alleged that Tarpey was operating a "bogus tax scheme." *Tarpey v. United States*, No. CV-17-94-B-BMM, 2019 WL 1255098, at *1 (D. Mont. Mar. 19, 2019). The government alleged Tarpey was using conflicted appraisers who overstated the value of the timeshares and that Tarpey "falsely told customers that they could deduct the full appraised amount of the timeshare, conducted by DFC, and the associated processing fees." *Id.* Between 2016 and 2017, the district court entered six orders permanently enjoining Tarpey, his sister, Broyles, Thor, Resort Closings, and DFC from continuing to appraise and accept timeshare donations. *See, e.g.*, *United States v. Tarpey*, 2:15-cv-00072-SEH, 2016 WL

6196497 (D. Mont. Sept. 28, 2016) (final judgment of permanent injunction against James Tarpey). The consent judgment against Tarpey permanently enjoined him from preparing property appraisals in connection with federal taxes, encouraging others to claim charitable contribution deductions on their taxes, and promoting any plan regarding charitable contribution deductions claimed on federal tax returns. *Id.* at *1.

## B. THE PRESENT ACTION

The IRS assessed penalties, pursuant to 26 U.S.C. § 6700, for Tarpey's timeshare donation business. *Tarpey*, 2019 WL 1255098, at *2. Tarpey paid a portion of the penalties and then filed suit, alleging that he was not liable for penalties, and alternatively, the IRS's penalty calculations were inaccurate. *Id.* The United States countersued, moving for summary judgment on Tarpey's liability under § 6700, and later for penalties owed. *Id.* The district court addressed the issues in this case in three orders, two on summary judgment and one after a bench trial.

### 1. Summary Judgment on Liability Regarding Two Appraisers

The district court held on summary judgment that Tarpey was liable for penalties under § 6700. *Id.* at *8. Section 6700 of the Internal Revenue Code imposes a penalty on promoters and others involved in the organization or sale of tax shelters if they make false statements or exaggerate valuation. In this circumstance, to establish liability under § 6700(a)(2)(A), the United States had to show that (1) Tarpey organized or sold, or participated in the organization or sale of, an entity, plan, or arrangement; (2) Tarpey made, or caused to be made, false or fraudulent statements concerning the tax benefits to be derived from the entity,

plan, or arrangement; (3) Tarpey knew or had reason to know that the statements were false or fraudulent; and (4) Tarpey's false or fraudulent statements pertained to a material matter. *Id.* at *2 (citing *United States v. Est. Pres. Servs.*, 202 F.3d 1093, 1098 (9th Cir. 2000)). Tarpey challenged only the second and third elements. *Id.*

The district court first determined that the second element, false statements, was satisfied. The court stated that "[t]he appraisals of timeshare to be donated to DFC represent the alleged false statements at issue." *Id.* at *3. The court noted that "[t]he United States asserts that Tarpey made false statements by preparing appraisals himself" and "caused others to make or furnish similar appraisals." *Id.*

Taxpayers must obtain a "qualified appraisal" of property if a donation of that property results in a claimed deduction of more than $5,000. *Id.* (citing 26 U.S.C. § 170(f)(11)(C), (E)). A qualified appraisal must be prepared, signed, and dated by a "qualified appraiser." 26 C.F.R. § 1.170A-13(c)(3)(i)(B). As applicable here, the Treasury regulations disqualify as an appraiser (i) the donee of the property, (ii) persons related to the donee, and (iii) persons used by the donee whose appraisal practice is not sufficiently diversified by performing the majority of their appraisals for persons other than the donee. *Id.* § 1.170A-13(c)(5)(iv)(C), (E), (F). The district court held that "Tarpey constitutes the donee," Tarpey and DFC are "related," and Tarpey, his sister, Broyles, and Thor were all disqualified pursuant to the last exclusion because they did not perform a majority of their appraisals for persons other than DFC. *Tarpey*, 2019 WL 1255098, at *3, *5. The court concluded that all four "lacked sufficient independence from DFC to serve as qualified appraisers under the Treasury Regulations," and "[t]he undisputed facts demonstrate,

therefore, that Tarpey made or furnished false statements regarding timeshare appraisals" and caused others to make or furnish such statements. *Id.* at *6.

The district court further determined that the government established the third element for liability—that Tarpey knew or had reason to know that the statements were false or fraudulent. *Id.* at *7. The court rejected Tarpey's reliance on advice of counsel argument, as the advice was general and unrelated to his appraisal practice. *Id.* at *6. As the court explained, the record did not establish that any professional "ever advised Tarpey that he met all of the criteria to serve as a qualified appraiser" under the Treasury regulations. *Id.* The court found that Tarpey knew or had reason to know that he made false statements "regarding qualified appraisal practice," in part because "Tarpey signed a 'Declaration of Appraiser' for each appraisal that he pe[r]formed" and "promised in this declaration that he knew the Treasury regulation exclusions." *Id.* at *7.

Based on these determinations, the district court concluded that Tarpey was liable for penalties under § 6700. *Id.* at *8.

### 2. *Summary Judgment on Scope of Penalties*

Section 6700(a) provides two methods for computing penalties, depending on whether a "gross valuation overstatement" or a false statement is involved. The parties agree that the computation method for conduct that involves false statements applies. Under this method, the penalty equals "50 percent of the gross income derived (or to be derived) from such activity." 26 U.S.C. § 6700(a)(2)(B). At summary judgment, the parties disputed the breadth of "activity" under the statute. Tarpey sought to limit the "activity" to appraisals he performed for DFC, limiting his

penalty to income derived from those appraisals. *Tarpey v. United States*, No. CV-17-94-BMM, 2019 WL 5820727, at *2 (D. Mont. Nov. 7, 2019). He contended that "each 'activity' must be proved separately and that the United States has proven appraisals as the only activity undertaken by Tarpey." *Id.* The United States argued that "the activity" encompassed the entire timeshare donation scheme, and DFC served as Tarpey's alter ego for the purposes of calculating a penalty. *Id.*

The district court turned to the text of § 6700(a) and determined that "[t]he 'activity' giving rise to the penalty against Tarpey encompasses the entire arrangement facilitated and organized by Tarpey to solicit timeshare donations, appraise the timeshares, and direct profits to his other organizations." *Id.* It went on to conclude that DFC's income should be imputed to Tarpey under the corporate-veil-piercing doctrine because DFC functioned as Tarpey's alter ego. *Id.* at *4–6.

### 3.  *Bench Trial on Amount of Penalties*

The case proceeded to a bench trial, with both parties submitting expert reports and testimony. The government's expert, Brian Dubinsky, "determined that Tarpey earned $22,323,437 in gross income from the activity between 2010 and 2013." *Tarpey v. United States*, No. CV-17-94-BU-BMM, 2021 WL 5955699, at *3 (D. Mont. Dec. 16, 2019). Dubinsky took the aggregate transactional data from the five entities over which Tarpey exercised control, identified the DFC-related transactions, included only income originating from donors or buyers, and removed internal transfers between the Tarpey entities. *Id.* at *3–4. Dubinsky's calculation would result in a penalty of $11,161,718.50, though the United States requested that the court order

Tarpey to pay the original penalty assessed of $8,465,000 plus interest. *Id.* at *4. The district court agreed with Dubinsky's calculation and ruled for the government. *Id.* at *7.

## II. ANALYSIS

Tarpey raises three issues on appeal. He challenges the district court's liability ruling as to two of the appraisers, Broyles and Thor; he contends that the court's "cumulative definition of 'activity'" contravenes the text of § 6700(a); and he urges that the court applied the wrong definition of "gross income."

### A. LIABILITY FOR OTHER APPRAISERS

The district court correctly determined that, as a matter of law, Broyles and Thor were disqualified as appraisers, and Tarpey forfeited his argument that he was unaware the appraisals would be imputed to DFC.

Broyles and Thor were disqualified because they appraised timeshares primarily, if not exclusively, for DFC. Nearly 100% (97.5%) of Broyles's income was from appraisals for DFC and DFC constituted 57% of Thor's appraisal business. *Tarpey*, 2019 WL 1255098, at *5. As relevant here, the Treasury regulations disqualify any "appraiser who is regularly used by" the donor—or is "regularly used" as an appraiser by a "party to the transaction in which the donor acquired the property being appraised" or the "donee of the property"—"and who does not perform a majority of his or her appraisals made during his or her taxable year for other persons." 26 C.F.R. § 1.170A-13(c)(5)(iv)(F), (B), (C).

The question on appeal is what "regularly used" means. Tarpey insists that the appraisals were not "used by" DFC

under § 1.170A-13. Instead, he claims the appraisals were "used by" the individual donors seeking charitable deductions because it is the donor—the timeshare owner—that "is required to attach an appraisal to their income tax return." Therefore, in his view, the appraisal is used only by "the person *claiming* the charitable deduction," rather than any donee that is accepting the contribution. He is mistaken.

Tarpey's "use" argument focuses on the first half of the exclusion in subsection F ("Exclusion F"), mistaking *a* form of use for *the exclusive use* in contravention of the text. Exclusion F does not limit use to use by the donor, and Tarpey's proposed meaning of "use" would read out subsections B and C of the regulation. *See* 26 C.F.R. § 1.170A-13(c)(5)(iv). Rather, the exclusion refers to three different persons: the donor, a party to the transaction, and the donee. *Id.* § 1.170A-13(c)(5)(iv)(F).

The record also belies Tarpey's creative position that DFC merely recommended, rather than used, appraisers. Tarpey, through DFC's timeshare donation program, profited off the appraisals. In his response to the government's statement of undisputed facts, Tarpey did not dispute that he "earned $149 when an appraiser other than himself prepared an appraisal of a timeshare to be donated to DFC, and caused that money to be paid to [Vacation Property Appraisers, Inc.]," another one of Tarpey's entities. VPA "received a total of **$641,737** for appraisals of timeshares to be donated to DFC," and Tarpey reported most of that amount on his individual income tax returns.

DFC also used the appraisals as a selling point, touting an appraisal "by an independent licensed appraiser" as an included benefit of the timeshare donation program. Consistent with this approach, an employee testified that she

didn't remember "any donors specifically questioning" an option of a different appraiser: "we said we would order it for them and they liked that." Broyles was "their appraiser," and Broyles thanked DFC employees in an email for "all of your help in referring Clients to us." Thor confirmed this arrangement. On this record, the district court correctly concluded that DFC "used" Broyles's and Thor's appraisals.

The district court also correctly determined at summary judgment that Tarpey knew or had reason to know Broyles and Thor were disqualified. Tarpey now contends that a trial is needed on this issue. Tarpey's sole argument in the district court in relation to the knowledge element of liability was that he relied on the advice of counsel. *Tarpey*, 2019 WL 1255098, at *6. The government produced forms that Tarpey signed with every appraisal that he prepared which include a declaration by the appraisers that they were not in one of the six categories of excluded individuals. *Id.* at *7. Tarpey never claimed he could not have foreseen that the IRS would consider DFC's involvement with the appraisers as "use," and he argued below that Resort Closings was really the client, so "it is irrelevant if James or any other appraiser performed all of his or her services for Resort Closings." Because Tarpey expressly stated that the number of appraisals would not have mattered and failed in the district court to include the current challenges to knowledge, Tarpey has forfeited his chance to advance this claim on appeal. "Although no bright line rule exists to determine whether a matter has been properly raised below, an issue will generally be deemed waived on appeal if the argument was not raised sufficiently for the trial court to rule on it." *In re Mercury Interactive Corp. Sec. Litig.*, 618 F.3d 988, 992 (9th Cir. 2010) (citation omitted) (cleaned up).

## B.  "ACTIVITY" UNDER § 6700(a)

Tarpey and the government next battle over the definition of "activity" under 26 U.S.C. § 6700(a).  The district court concluded that the entire timeshare donation business was part of a tax-avoidance scheme, and the plain language of the provision allows the entire scheme to fall within the scope of "activity."  The government endorses this position.  Urging us to focus on the "separate activity" language in the second sentence of § 6700(a) instead, Tarpey insists that the penalty cannot go beyond the *appraisal portion* of his business, which he claims was the only activity linked to making a false statement.

In construing § 6700, we turn to the text, guided by Congress's intervention in shaping the current statute. Congress adopted § 6700 as part of the Tax Equity and Fiscal Responsibility Act of 1982.  *See Est. Pres. Servs.*, 202 F.3d at 1098.  To understand the import of the amendments over time, it is helpful to separate the sentences of the text and annotate the current form of the statute.  The sentences are broken out below; underlined language shows text added or changed in 1989, and italicized language shows text added in 2004. Section 6700(a) states:

(a)  Imposition of penalty

**[First Sentence]** Any person who--

  (1)

  (A) organizes (or assists in the organization of)--

  (i) a partnership or other entity,

  (ii) any investment plan or arrangement, or

  (iii) any other plan or arrangement, or

(B) participates (directly or indirectly) in the sale of any interest in an entity or plan or arrangement referred to in subparagraph (A), and

(2) makes or furnishes or causes another person to make or furnish (in connection with such organization or sale)--

(A) a statement with respect to the allowability of any deduction or credit, the excludability of any income, or the securing of any other tax benefit by reason of holding an interest in the entity or participating in the plan or arrangement which the person knows or has reason to know is false or fraudulent as to any material matter, or

(B) a gross valuation overstatement as to any material matter,

shall pay, with respect to each activity described in paragraph (1), a penalty equal to $1,000 or, if the person establishes that it is lesser, 100 percent of the gross income derived (or to be derived) by such person from such activity.

**[Second Sentence]** For purposes of the preceding sentence, activities described in paragraph (1)(A) with respect to each entity or arrangement shall be treated as a separate activity and participation in each sale described in paragraph (1)(B) shall be so treated.

**[Third Sentence]** *Notwithstanding the first sentence, if an activity with respect to which a penalty imposed under this subsection involves a statement described in paragraph (2)(A), the amount of the penalty shall be equal to 50 percent of the gross income derived (or to be derived) from such*

*activity by the person on which the penalty is imposed.*

Congress had amended the statute four times, though only two changes—in 1989 and 2004—are discussed here.[1] The original language included only the first sentence, less some words added or substituted in 1989. *See* Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. No. 97-248, § 320(a), 96 Stat. 324, 611 (1982). In 1989, Congress added the second sentence—"For purposes of the preceding sentence . . ."—to resolve a circuit split over the meaning of "activity." *See* Omnibus Budget Reconciliation Act of 1989, Pub. L. No. 101-239, § 7734(a)(3), 103 Stat. 2106, 2403 (1989). Before the 1989 amendment, some courts had held that each sale was a separate activity subject to a minimum penalty of $1,000, while other courts held that multiple sales of a single tax shelter constituted one activity. *See, e.g.*, *Bond v. United States*, 872 F.2d 898, 900–01 (9th Cir. 1989) (adopting the latter approach). The 1989 amendment codified the former interpretation. "Congress ended the confusion over 'activity' by amending section 6700 and clarifying that 'activity' refers to an individual sale; and in so doing, Congress returned the penalty to its divisible state." *Humphrey v. United States*, 854 F. Supp. 2d 1301, 1306 (N.D. Ga. 2011).

In 2004, Congress added the third sentence—the method applicable to false statements and the relevant method here. *See* American Jobs Creation Act of 2004, Pub. L. No. 108-

---

[1] Other amendments in 1984 and 2018 are minor substitutions that do not affect the outcome of this case. *See* Deficit Reduction Act of 1984, Pub. L. No. 98-369, § 143(a), 98 Stat. 494, 682 (1984); Consolidated Appropriations Act of 2018, Pub. L. No. 115-141, § 401(a)(314), 132 Stat. 348, 1199 (2018).

357, § 818(a), 118 Stat. 1418, 1584 (2004). The rationale was that "the present-law $1,000 penalty for tax shelter promoters is insufficient to deter tax shelter activities." H.R. Rep. No. 108-548, pt. 1, at 274 (2004).

On appeal, both Tarpey and the government argue that § 6700 is divisible. The few courts that have considered the issue agree, although the question of divisibility does not drive the result here. The caselaw and legislative history focus heavily on the second sentence of the 1989 amended version—a situation that is not present in the case before us. The focus of the 1989 amended version is whether the "activity" involving gross valuation overstatements cleared the $1,000 per activity penalty threshold or whether the court should use gross income. Congress clarified that each sale was its own activity, avoiding a situation where a promoter makes 100 sales and walks away with a $1,000 total penalty. *See, e.g.*, *Humphrey*, 854 F. Supp. 2d at 1307.[2] In the case before us, we instead focus on the 2004 amended version

---

[2] Other trial courts reached the same conclusion. *See, e.g.*, *Schulz v. United States,* No. 1:15-cv-01299 (BKS/CFH), 2018 WL 3405240, at *5 (N.D.N.Y. July 12, 2018) ("Here, the particular activities at issue, as defined by the Government, are 225 distributions of the Blue Folder."), *aff'd*, 831 F. App'x 48 (2d Cir. 2020); *Diversified Grp., Inc. v. United States*, 123 Fed. Cl. 442, 454 (2015) ("The [1989] amended statute expressly provides that the penalty imposed for selling or promoting an abusive tax shelter, based upon the activities within the tax shelter, is divisible, outlining that 'each entity or arrangement shall be treated as a separate activity, and participation in each sale . . . shall be so treated.'" (alteration in original)), *aff'd*, 841 F.3d 975 (Fed. Cir. 2016); *Pfaff v. United States*, No. 14-CV-03349-PAB-NYW, 2016 WL 915738, at *3 (D. Colo. Mar. 10, 2016) ("[Section] 6700 contains additional language that explains the basis on which § 6700 penalties are divisible: 'activities described in paragraph (1)(A) with respect to each entity or arrangement shall be treated as a separate activity and participation in each sale described in paragraph 1(B) shall be so treated.'").

which adds a 50% gross income calculation for an activity involving false statements.  The 1989 amendment and the "second sentence" are not at issue.

Relying upon this precedent related to the 1989 amendment, the parties tie themselves into knots justifying their differing outcomes.  The government contends for the first time that there was a false statement attached to every transaction, and Tarpey insists that "activity" is effectively synonymous with "false statement."  A close reading of the statute reveals that the solution is far simpler.  The focus should be on the third sentence of the statute because the case involves false statements, not an overstatement of valuation.

Section 6700 defines activity broadly to include any "plan" or "arrangement." *See* 26 U.S.C. § 6700(a)(1)(A)(iii). Tarpey does not challenge the element that he organized the timeshare donation plan, which easily qualifies as a plan or arrangement. *Tarpey*, 2019 WL 5820727, at *3.  The statute then lays out two computation methods.  There is the first computation method, set out in the first sentence, amended by Congress to resolve a circuit split:

> [A person found liable] shall pay, with respect to each activity described in paragraph (1), a penalty equal to $1,000 or, if the person establishes that it is lesser, 100 percent of the gross income derived (or to be derived) by such person from such activity.

§ 6700(a)(2)(B).  The plain language of the statute makes clear that the "separate activity" requirement in the second

sentence modifies the computation method in the first sentence:

> *For purposes of the preceding sentence*, activities described in paragraph (1)(A) with respect to each entity or arrangement shall be treated *as a separate activity* and participation in each sale described in paragraph (1)(B) shall be so treated.

*Id.* (emphasis added). The cases cited earlier rest on this penalty computation.

Then there is another method in the third sentence, the computation of penalties for false statements, an amendment added in 2004:

> *Notwithstanding the first sentence*, if an activity with respect to which a penalty imposed under this subsection involves a statement described in paragraph (2)(A), the amount of the penalty shall be equal to 50 percent of the gross income derived (or to be derived) from such activity by the person on which the penalty is imposed.

*Id.* (emphasis added). The plain language of the statute states that the third sentence applies "notwithstanding the first sentence," so the statute contemplates that the penalties for false and fraudulent statements will be treated differently. Under the applicable computation method, we consider that "the amount of the penalty shall be equal to 50 percent of the gross income derived (or to be derived) from such activity by the person on which the penalty is imposed." *Id.*

How then do we understand the scope of activity?  We look to the earlier portion of the statute to determine what "each activity described in paragraph (1)" entails.  *Id.* Paragraph (1) includes the broad "organization" of "any other plan or arrangement."  § 6700(a)(1)(A); *see Hargrove & Costanzo v. United States*, No. CV-F-06-046 LJO DLB, 2008 WL 4133928, at *6 (E.D. Cal. Sept. 4, 2008) ("The two activities which are 'described in paragraph (1)' are the activity of 'organizes' and the activity of 'participates.'"). The activity here is not limited to the making of false statements in furtherance of a scheme, but rather the organization and sale of the tax scheme writ large.  The statute mandates that Tarpey's gross income be calculated from his organizational and sale conduct, rather than solely from the false statements he made about the activity alone. The Tax Court already appears to adopt this approach. *See Davison v. Comm'r*, 119 T.C.M. (CCH) 1373, 2020 WL 2498420, at *23 (2020) ("[T]he penalty is appropriately calculated as 50% of the gross income petitioner derived from selling, or participating in selling, the Tool Program."); *Lemay v. Comm'r*, 119 T.C.M. (CCH) 1389, 2020 WL 2498427, at *24 (2020), *aff'd*, 128 A.F.T.R.2d 2021-5745 (10th Cir. 2021) (same); *see also Seaview Trading, LLC v. Comm'r*, 62 F.4th 1131, 1135 (9th Cir. 2023) (en banc) ("Although Tax Court decisions do not bind us, we have consistently recognized that court's unique expertise in tax matters, and here we find its decisions persuasive." (citation omitted)).  It would go against the text and common sense to limit liability only to the false statements when Congress's goal was to punish abusive tax shelters.  The district court's decision is consistent with this analysis and we too adopt this approach.

The activity encompasses the scheme while simultaneously being made up of the individual timeshare donation transactions. The government's expert, Dubinsky, excluded transactions unrelated to the timeshare donation program then aggregated the gross income derived from the 7,600 timeshare donation transactions. *Tarpey*, 2021 WL 5955699, at *3–4. The government does not need to limit itself to the funds directly coming from the false statement appraisals, as the 7,600 transactions made up an overarching scheme that flowed into further gross income for Tarpey and DFC. Thus, the activity can be made up of an aggregation of transactions without being limited to only those transactions that explicitly contained a false statement.

In the face of the correct application of the term "activity," Tarpey now claims this approach makes it more difficult to establish jurisdiction under 26 U.S.C. § 6703(c). Not so. A taxpayer may obtain jurisdiction over a refund suit for a penalty assessed under § 6700 by satisfying the timing and payment requirements, which require a taxpayer to pay 15% of the assessed penalty and file a refund claim within 30 days of the IRS's notice of the penalty before filing a refund suit within 30 days of the denial of that claim. *See* § 6703(c)(1)–(2). Tarpey paid 15% of his 2010 penalty, while his sister paid 15% of her 2014 penalty. The parties stipulated to these facts as satisfying jurisdiction under § 6703(c), and the government continues to contend that this payment secured jurisdiction. In his reply brief, however, Tarpey claims for the first time that his payment of the 2010 assessed penalty is inadequate, as it would at most garner jurisdiction over one tax year.

We are skeptical of Tarpey's newly crafted interpretation. Section 6703(c)(1) provides that upon "notice and demand of any penalty under section 6700," the person charged can pay

"an amount which is not less than 15 percent of the amount of such penalty."  The IRS sent four separate Notice of Penalty Charge assessments to Tarpey in 2017 for tax years 2010 through 2014.  Each Notice of Penalty Charge states "[w]ithin 30 days after the date of this Notice and Demand, pay an amount which is not less than 15 percent of the penalty and file a claim for refund."  The IRS deemed Tarpey's payment of one penalty demand adequate, and we agree that this is not an unreasonable reading of the statute.

## C.  CALCULATING GROSS INCOME

Tarpey's final challenge is that the district court applied the wrong definition of gross income and erroneously included money held in escrow.  We review for clear error the district court's factual findings on the amount of the penalty and its legal conclusions de novo, and we are not persuaded by Tarpey's position.  *Cooper v. Comm'r*, 877 F.3d 1086, 1090 (9th Cir. 2017).

The district court properly relied on the Internal Revenue Code's general definition of gross income, stating that "[g]ross income includes 'all income from whatever source derived.'"  *Tarpey*, 2021 WL 5955699, at *6 (quoting 26 U.S.C. § 61(a)).  Tarpey nevertheless points to Dubinsky's statement that his penalty calculation total was not "quote/unquote 'the gross income' of Mr. Tarpey in the normal sense of taxation" as evidence that the district court departed from the statutory definition in accepting his calculations.  Tarpey's take on Dubinsky's testimony is misleading.  He portrays the "normal sense of taxation" statement as an acknowledgment that the court had departed from the statutory definition when in fact Dubinsky was

instead clarifying that his calculation included income attributable to Tarpey's alter ego, DFC:

> Q. And just for the record, Mr. Dubinsky, can you restate your final opinion on the gross income you calculated for Mr. Tarpey under 26 USC 6700?
>
> A. Yes. And just so it's clear, when you say -- I'm going to term it -- this is the gross income that would be attributable to the activity to which Mr. Tarpey -- that the Court has determined is subject to the penalty. This is not quote/unquote "the gross income" of Mr. Tarpey in the normal sense of taxation.

Read in context, Dubinsky's statement explains that the total penalty exceeds the gross income of Tarpey as an individual. Based on the district court's finding that DFC was Tarpey's alter ego—a conclusion not challenged on appeal—Dubinsky included gross income from the entity as well. Tarpey's definitional challenge is a red herring.

Tarpey next argues that the transactions "involved the acquisition and sale of real property," and therefore he should have been eligible to capitalize his expenses related to the acquisition and sale of property under 26 U.S.C. § 61(a)(3) and § 263A. This position ignores the district court's finding that Tarpey did not operate DFC as a dealer in real property, and instead he benefited from organizing it as a tax-exempt 501(c)(3) organization. *See Tarpey*, 2021 WL 5955699, at * 5–6. The Supreme Court "has observed repeatedly that, while a taxpayer is free to organize his affairs as he chooses, nevertheless, once having done so, he must accept the tax consequences of his choice, whether contemplated or not."

*Comm'r v. Nat'l Alfalfa Dehydrating & Milling Co.*, 417 U.S. 134, 149 (1974). Tarpey "may not enjoy the benefit of some other route he might have chosen to follow but did not." *Id.* Now is not the time to change horses midstream. The district court reasonably declined to give Tarpey the benefit of a different choice after the fact. *See Tarpey*, 2021 WL 5955699, at *6.

On appeal, Tarpey expands his argument beyond DFC's status to encompass the activity of all his entities. His theory is that he should be allowed to capitalize his expenses under § 61(a)(3) because, "taken collectively," the "principal activity" of his entities was the acquisition and sale of timeshares.

The few cases that have discussed penalties under § 6700 have not reduced expenses. In *Schulz v. United States*, the government argued that "the penalty is based on gross income, not income less fees or costs or costs of goods sold." 2019 WL 1385405, at *4. The court agreed, noting that "[g]ross income means 'all income from whatever source derived'" and the penalty was properly calculated "without regard to fees charged." *Id.*; *see also In re MDL-731*, 989 F.2d 1290, 1304 (2d Cir. 1993) ("Because the Internal Revenue Code does not provide an exclusion from gross income for the cost of leased goods, the district court correctly declined to grant a reduction equal to the cash downpayments made on the Properties from Townsend's and Universal's gross income."). We recently affirmed a decision by the tax court that explained that all taxpayers "pay tax only on gross income, which is gross receipts minus the cost of goods sold." *Patients Mut. Assistance Collective Corp. v. Comm'r*, 151 T.C. 176, 204 (2018), *aff'd*, 995 F.3d 671 (9th Cir. 2021). Cost of goods sold does not offer Tarpey much help, as it includes only "the costs of acquiring

inventory, through either purchase or production." *Id.* at 205. One of Tarpey's experts, Thomas Copley, admitted that there were no acquisition costs with the donated timeshares:

> Q. And so, obviously, because timeshares were donated, there were no costs associated with DFC's acquisition of the property. Is that fair to say?
>
> A. In the initial acquisition there were no costs incurred.
>
> Q. That is, DFC didn't pay a single cent to acquire the timeshares; right?
>
> A. To acquire the timeshares, they did not pay. Those were donated, correct.

The district court's refusal to deduct expenses was not clearly erroneous.

Finally, Tarpey argues that the district court erroneously "concluded that, as a matter of law, the funds deposited into the escrow account managed by RCI vested in Mr. Tarpey simply because he owned RCI." Tarpey asks that any "funds deposited into escrow" not count towards his gross income. Tarpey mischaracterizes the district court's finding. Rather than deciding that money held in escrow could, as a matter of law, be included in the calculation of gross income, the district court more narrowly concluded that the "escrow account" here was not a true escrow account. *Tarpey*, 2021 WL 5955699, at *4. It acknowledged that a "taxpayer's gross income normally does not include money paid into escrow because the taxpayer lacks 'complete dominion' over the sum." *Id.* (quoting *Ware v. Comm'r*, 906 F.2d 62, 65 (2d Cir. 1990)). But this principle does not come into play because

"Tarpey did not maintain a true escrow arrangement," as he "exercised 'complete dominion' over Account 6655, as evidenced by the comingling of funds from multiple donors and frequent bulk transfers." *Id.* at \*4–5. Though Tarpey insists the district court made a legal error, this fact-specific finding about the nature of the RCI account is more properly viewed under the clear error standard. *See Est. Pres. Servs.*, 202 F.3d at 1099.

The Supreme Court has explained that "[i]n determining whether a taxpayer enjoys 'complete dominion' over a given sum . . . [t]he key is whether the taxpayer has some guarantee that he will be allowed to keep the money." *Comm'r v. Indianapolis Power & Light Co.*, 493 U.S. 203, 210 (1990). A powerful piece of evidence for including the funds as part of gross income is Tarpey's inclusions of these funds on his tax returns—a fact that the district court said "demonstrates conclusively that the money in Account 96655 remained within Tarpey's control." *Tarpey*, 2021 WL 5955699, at \*5. Tarpey argues that the court erred because "DFC—not Mr. Tarpey—amended its returns to show the entire amount deposited into the escrow account as part of its gross receipts." Given that Tarpey has not challenged the alter ego conclusion, Tarpey and DFC are treated as interchangeable for the purposes of calculating the penalty. His challenge therefore misses the evidentiary point.

Based on a fact-intensive analysis, the district court did not err in concluding that Tarpey had "some guarantee that [he] will be allowed to keep the money." *Id.* The testimony supported the district court's fact-intensive conclusion, and the district court correctly determined that the fees held in Resort Closings' account should not be excluded from the gross income calculation.

**AFFIRMED.**